**UNITED STATES of America**
**v.**
**James Peter PARDUE.**
**Crim. No. 12758.**

United States District Court,
D. Connecticut.

March 1, 1973.

---

Stewart H. Jones, U. S. Atty., Leslie Byelas, Andrew Bowman, Asst. U. S. Attys., Bridgeport, Conn., for plaintiff.

Jacob D. Zeldes, Elaine Amendola, Zeldes, Needle & Cooper, Bridgeport, Conn., for defendant.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

This case again "demonstrates in the strongest terms the glaring need for federal legislation in regard to long-term detention for treatment of mentally incompetent defendants." United States v. Walker, 335 F.Supp. 705 (N.D.Cal. 1971). It is indeed lamentable when a federal judge, in his attempt to provide for the care of a pretrial detainee who is mentally ill, is confronted with the following painful alternatives: either to authorize the continued incarceration of a defendant in violation of his constitutional rights, or to release him into the community where he may be a danger to himself and to the public.

The plain fact of the matter is that there are no federal facilities which offer appropriate psychiatric services and adequate security for the treatment of the defendant with a mental disorder,

not temporary in nature. Federal legislation in this area is desperately needed; the Court trusts Congressional action soon will be forthcoming.

## I.

On February 13, 1970, a bomb exploded in the Danbury Police Station, destroying the alarm system connected to the Union Savings Bank located around the corner from the police headquarters. Within minutes the bank was robbed by two armed men who detonated a second bomb as they left the building. The explosion shattered the bank and injured 26 persons. Shortly thereafter a third explosive was set off in the getaway car which had been abandoned by the robbers in a nearby parking lot. In the confusion and terror which followed these explosions, the robbers successfully escaped.

An intensive investigation by the F. B.I. culminated in the arrest of the defendant, James Pardue, and his brother, John Pardue, on March 7, 1970. Both men pleaded not guilty to an indictment charging them with various violations of the Bank Robbery Act.

On May 11, 1970, Dr. Edwin L. Dawe, an eminent psychiatrist, was appointed to examine James to determine his mental competency. See 18 U.S.C. § 4244. A hearing was held on July 7, 1970, after which this Court declared James insane and unable to understand the charges against him. He was ordered, pursuant to 18 U.S.C. § 4246, committed to the custody of the Attorney General until he became competent to stand trial or until the charges pending against him were disposed of in some other manner.

On July 17, 1970, James was admitted to the Medical Center for Federal Prisoners at Springfield, Missouri. Within a matter of a few weeks, the medical staff at Springfield reported that James had recovered from his illness and recommended that he be returned to Connecticut "for further hearing on his present competency to stand trial." Accordingly, the Court held a series of hearings which were adjourned from time to time in order to permit further psychiatric examinations and to accommodate out-of-state witnesses.

Dr. Harold B. Fain, the government's main witness, testified that although James "may be going through a little emotional upset or something," there was not "any evidence of an overt psychosis." However, after cross-examination, it was evident that the doctor's conclusions were open to serious doubt and, therefore, the Court decided to have James reexamined by Dr. Dawe and by still another psychiatrist, Dr. Marc Rubenstein, Assistant Clinical Professor of Psychiatry at Yale University. They agreed that James was in an acute confusional schizophrenic state, was not malingering, and could not possibly assist in his own defense. This Court again found James to be mentally incompetent and ordered his return to the Springfield Medical Center.

In the following months, the Court continued to receive periodic medical reports which indicated James was "still actively paranoid schizophrenic." Despite this, in May, 1971, the Director of the Bureau of Prisons advised that James' "present condition warrants his return to your court for further hearing on his present competency to stand trial." The Director also referred to the opinion of the staff at the Medical Center "that in all probability the patient will not cooperate since in the past Mr. Pardue has used his medical condition to manipulate."

Both Dr. Dawe and Dr. Rubenstein were assigned to reexamine James and found him to be hallucinating, delusional and suffering from Catatonic Schizophrenia. In reply to governmental contentions that James was malingering, Dr. Dawe, after describing the common patterns of the Ganser Syndrome (prison psychosis) in which inmates may unconsciously mimic symptoms of mental illness, concluded:

> Conscious mimicry would require not only acting skill of incredible degree, but an extremely profound and sophis-

ticated knowledge of, and experience in, the entire field of abnormal psychology (for the imposter would need to know not only what to simulate but also what on no account to simulate); the man would need to be totally consistent and be on guard day and night for an indefinite period lest he slip and betray himself. In short, he would need to be a man of truly exceptional attainments and intelligence, and there is nothing in Mr. Pardue's known history to indicate that he is possessed of these superlative skills. The doctors strongly recommended that James not be returned to the Springfield Medical Center, but transferred to an institution where he could receive "adequate and appropriate treatment."

While the Court was conducting a series of formal competency hearings in the fall of 1971, it became apparent that the Assistant United States Attorney in charge of the case realized he could not carry the requisite burden of proof to demonstrate competency. Therefore, this Court held several informal conferences with counsel in which various procedural avenues were explored, including: 1) returning James to the Springfield Medical Center; 2) arranging for his commitment to a mental institution in Maryland, the state of his residence; 3) encouraging his prosecution by the State of Connecticut on a detainer charging him with armed robbery; 4) authorizing a contract between the Bureau of Prisons and the State of Connecticut whereby James would be confined for treatment in one of Connecticut's mental hospitals at federal expense.

▮ The first course of action was promptly rejected; the Federal Medical Center does not qualify as a psychiatric hospital. Henry v. Ciccone, 440 F.2d 1052, 1054 (8 Cir. 1971); Guy v. Ciccone, 439 F.2d 400, 402 (8 Cir. 1971); United States v. Jackson, 306 F.Supp. 4, 6 (N.D.Cal.1969). Hospitalization in Maryland was not deemed feasible because it was learned that all criminal charges against James had to be dismissed before he was eligible to enter one of the state's institutions. Discussions with Connecticut's local prosecutor indicated some reluctance to proceed on an armed robbery charge, and this possibility was not pursued further. Accordingly, the Court opted for the fourth alternative for the following reasons: 1) there was no question in the Court's mind that James was a seriously mentally ill defendant; 2) dismissal of the federal criminal charges would not serve the public interest; 3) Connecticut's mental institutions could provide satisfactory psychiatric care; and 4) Connecticut officials, defense counsel, and the Assistant United States Attorney were agreeable to confine James as a federal prisoner in a state hospital for the treatment he so sorely needed.

As a consequence, on November 18, 1971, this Court issued the following orders:

1. Negotiations between the State of Connecticut and the United States government must immediately commence in order to secure James Pardue's confinement in an appropriate State facility. The government shall pay for all medical treatment rendered Mr. Pardue by State physicians.

2. If necessary, the government must supplement Mr. Pardue's medical care received in the State institution by retaining the services of a private psychiatrist who will be paid by the government.

Although this Court believed its orders were crystal clear and would serve temporarily to settle the matter, it soon learned that counsel for the parties were in disagreement as to the meaning and effect of the orders.

On December 21, 1971, defense counsel filed another in a series of motions to dismiss, alleging that the government flagrantly failed to comply with the Court's orders, that James had been transferred to the Connecticut Correctional Institution at Somers, a state prison, that there was no plan to commit him to a state hospital, and that he

should be released from federal custody. In reply, the government indicated that it "ha[d] exhausted its efforts to place James in a State Institution within the District of Connecticut," and that James had been recently transferred to the Federal Correctional Institution at Danbury, Connecticut and was receiving adequate treatment from Dr. A. J. D'Alessandro, the full-time psychiatrist at the Danbury prison. In addition, the government filed a motion to modify the conditions of the Court's orders issued on November 18, 1971. It argued that since James was in need of long-term hospitalization, he should be returned to the F.M.C. in Springfield, Missouri.

This surprising turn of events, coupled with the government's astonishing suggestion that James be transferred to the very setting from which this Court struggled to extricate him, necessitated another hearing on February 3, 1972. At that time it was learned that the Bureau of Prisons refused to enter into the contract with the State of Connecticut because no state hospital had "adequate security" to house James.[1] Yet, Dr. D'Allesandro testified that James was a "schizophrenic, chronic undifferentiated type" who was in dire need of intensive psychiatric hospitalization. Thus the Court was faced with this dilemma: the state could provide the necessary medical treatment but its facilities reportedly lacked the requisite security; the government's institutions could supply proper security, but not appropriate medical care. The Court thereupon denied the government's request to return James to the F. M. C.; it also reserved decision on the motion to dismiss on the ground it would be "unconscionable" to release James to the street.

To resolve the dilemma, another hearing was set for February 28, 1972, at which representatives from the Bureau of Prisons, state correctional officials, and local law enforcement officers were requested to attend. After lengthy proceedings, the Court ordered the Bureau of Prisons "to confine James Pardue in a security treatment center which will provide adequate psychiatric treatment for him and at the same time provide sufficient security for his confinement." In an effort to comply with this order, the government maintained James in the Correctional Institution at Danbury and retained the services of Dr. Dawe to treat him as a private patient.

This plan proved unsatisfactory. Report after report from Dr. Dawe stated that James was not improving and that he could not be treated in a prison setting. The doctor emphasized that medical care could only be provided in a "fully staffed and equipped specialized psychiatric hospital." Defense counsel filed a barrage of motions, including renewed motions to dismiss. The government countered with its own motions to have James declared a danger to the community and to have James returned to the F. M. C. Prior to a hearing on these motions, the Court and counsel conferred for several hours in chambers but were unable to resolve the issue.

At the hearing, the Court heard at length the testimony of various psychiatrists, members of the Pardue family, and law enforcement agents. Dr. D'Allesandro acknowledged that James was incompetent to stand trial, that the prognosis for recovery was dim, and that James would be a danger to himself, if released. Dr. Dawe reiterated that James was a schizophrenic but stated that "given adequate intensive psychiatric treatment, his condition could be improved to the point where he would be able to came to trial." He further noted that James should be confined for his own safety and for "the safety of

---

1. Inspector Warren A. Wirth of the Bureau of Prisons reported that commitment to the Connecticut Valley Hospital could not .be approved because "from a security standpoint, the patients remain in the hospital simply because they want to stay." He then listed a variety of imaginative ways in which inmates could escape including using the patients' courtyard volley ball nets as rope ladders to scale the hospital's walls.

others," that treatment in a state mental institution, not a federal prison hospital, was required, and that James was like a "sleeping volcano" who for delusional reasons might likely erupt to injure any person nearby. Mrs. Dorothy Pardue, James' mother, who on several occasions had requested that the Court release James to her care for civil commitment in a state hospital, testified she would admit James into a state mental facility if federal charges were dismissed even though "from my observation, I don't think he needs treatment."

At the conclusion of the testimonial evidence, counsel agreed upon a briefing schedule. The matter is now ripe for decision.

## II.

It is hardly contestable that James is in an extreme state of mental illness and in desperate need of intensive medical treatment in a psychiatric hospital. A recent report from Dr. Dawe vividly illustrates his present condition:

> This man [James Pardue] was moved back to the Custodial section [of the F. C. I.] yesterday. Almost immediately, he regressed into a withdrawn, mute and inert state, is unresponsive and taking no nourishment. When Mr. Czarnecki and I saw him this morning, Mr. Pardue was lying curled up in foetal position, fists clenched and covering his eyes. There was considerable muscular rigidity and he resisted when his hands were moved to shine a light in his eyes, resuming the same position with his face turned into the pillow. Pupils are reactive to light, and he is conscious but in a very regressed and near catatonic state. His lips did not move and he made no response to, nor showed any sign of having heard, words addressed to him. It is probable that the transfer to Custodial reinforced his delusions and caused this regression; it demonstrates how ill this man is and that one should not be misled by apparent good adjustment in the non-

stressful circumstances of the Hospital area . . . . This man's condition is not appropriate to the F. C. I., and he should be transferred to a psychiatric hospital as soon as possible.

Moreover, there is sufficient evidence that James is highly dangerous and must be confined for his own benefit and the protection of the public.

The record rebuts any contention that James' present condition can be remedied in a federal penal-type institution, even with a qualified psychiatrist privately assigned to his care. Mental rehabilitation is possible only with a long-term commitment in a state psychiatric hospital where the facilities and personnel are available to treat a person as seriously ill as James.

## III.

Applying the legal principles enunciated in the leading decisions on the subject to the facts of the instant case, the following conclusions emerge:

1. This Court has now exhausted the federal statutory scheme for commitment of a pretrial detainee who is insane and mentally incompetent to stand trial. A series of comprehensive hearings have been held, spanning a period of almost three years, pursuant to the provisions of 18 U.S.C. §§ 4244–4248. Since James was declared incompetent on July 9, 1970, he has been shuttled around and confined in seven different correctional institutions. He has not been nor will he in the foreseeable future be able to stand trial on the charges outstanding against him.

2. There is no federal facility available in which he can receive effective medical and psychiatric care and attention. As Justice Clark, sitting by designation, stated in Henry v. Ciccone, supra, 440 F.2d at 1054: "Again and again we have recognized that the F. M. C. is a penal institution and that one confined there suffers incarceration." See, also, United States v. Walker, su-

pra, 335 F.Supp. at 709; United States v. Jackson, supra, 306 F.Supp. at 6.[2]

3. Although an extremely dangerous person, cf. Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), James' chances of attaining competency under the present conditions of his confinement are almost impossible. Cf. Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

4. James' continued detention as a mentally deficient accused, without adequate treatment, has reached constitutional dimensions. His right to a speedy trial is now in jeopardy, and serious questions of due process and cruel and unusual punishment are present.

In United States v. Walker, supra, Judge Peckham found that the defendant was incompetent to stand trial, that the defendant's confinement for over a year under § 4246 was an unconstitutional commitment, and that the defendant had to be released from federal custody. Judge Zirpoli, in an analogous situation, reached a similar conclusion in United States v. Jackson, supra. In that case, Jackson was involved in the armed robbery of a bank in 1967, and, after presentation for plea, he was sent to the F. M. C. for a mental examination. Subsequently he was declared incompetent to stand trial. For the next 18 months he was confined at the F. M. C. until his return to court in August, 1969, upon the recommendation of the Director of the Center. After another competency hearing, the court concluded that Jackson was incompetent, that his mental illness was not transitory, and that he could not be cured in the fore-

seeable future. Citing recent developments in the field of mental illness, crime and the judicial response, Judge Zirpoli concluded:

Mandatory commitment, absent treatment lays bare sec. 4246 to seemingly incurable constitutional infirmities . . . . Since there is no federal provision for civil commitment this court cannot direct petitioner's further confinement. Consequently, the petitioner is discharged from federal custody.

■ In the instant case, James' confinement has reached and surpassed any reasonable period of time permitted under §§ 4244–4246 commitments. The delay in a final determination has been due to the Court's vain hopes and futile efforts to find a satisfactory solution to James' predicament. It now appearing that there is no other alternative, James must be discharged from federal custody.

Accordingly, with great reluctance, it is hereby

Ordered:

1. That James Pardue be released from federal custody and confinement;

2. That the defendant's motion to dismiss the indictment is granted; and it is further

Ordered:

That the effective dates of these orders be stayed for a period of 30 days to enable the government, if it wishes, to appeal to the Court of Appeals for the Second Circuit, or to make arrangements with appropriate state officials for the care, custody and treatment of James Pardue in the future.

---

2. The Court has recently been informed that a new Federal Behavior Research Center, a hospital which will treat federal prisoners suffering from mental disorders, is being constructed at Butner, North Carolina. Since the anticipated completion date is February, 1974, the information is of no assistance in this case.