550 F.2d 1122
 Patricia WELSCH et al., Appellees,
v.
Vera J. LIKINS, Commissioner of the Department of Public
Welfare of the State of Minnesota, et al., Appellants.
Patricia WELSCH et al., Appellees,
v.
Vera J. LIKINS, Commissioner of the Department of Public
Welfare of the State of Minnesota, et al., Appellants.
 Nos. 76-1473, 76-1797.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1977.
Decided March 9, 1977.
 
 Thomas L. Fabel, Deputy Atty. Gen., Dept. of Public Welfare, St. Paul, Minn., for appellants; Warren R. Spannaus, Atty. Gen., St. Paul, Minn., on brief.
 Luther A. Granquist, Legal Aid Society, Minneapolis, Minn., on brief for appellees.
 Philip B. Kurland and Daniel D. Polsby, Chicago, Ill., for Senate and House of Representatives of State of Minnesota, amici curiae.
 William J. Janklow, Atty. Gen., Pierre, S. D., for State of South Dakota, amici curiae.
 John L. Hill, Atty. Gen. of Texas, David M. Kendall, 1st Asst. Atty. Gen., Thomas W. Choate, Special Asst. Atty. Gen. for State of Texas, Austin, Tex., Robert L. Shevin, Atty. Gen. for State of Florida, Tallahassee, Fla., Ronald Y. Amemiya, Atty. Gen. for State of Hawaii, Honolulu, Hawaii, and Brooks McLemore, Atty. Gen. for State of Tennessee, Nashville, Tenn., and Paul L. Douglas, Atty. Gen. of Neb., Lincoln, Neb., for State of Texas, amicus curiae.
 Paul R. Friedman, Jane Bloom Yohalem and Patricia M. Wald, Mental Health Law Project, Washington, D. C., on brief of amici curiae, National Ass'n for Retarded Citizens, Minnesota Ass'n for Retarded Citizens and Council for Exceptional Children.
 Jeffrey Cooper, J. Justin Blewitt, Deputy Attys. Gen., Chief, Civil Litigation and Robert P. Kane, Atty. Gen., Dept. of Justice, Harrisburg, Pa., on brief of amicus curiae, Commonwealth of Pennsylvania.
 Before BRIGHT and HENLEY, Circuit Judges, and HARPER, Senior District Judge.*
 HENLEY, Circuit Judge.
 
 
 1
 These two appeals, arising out of the same case, come to us from the United States District Court for the District of Minnesota.[1] The defendants are, respectively, the Commissioner of Public Welfare of the State of Minnesota, certain subordinate officials of the Department, the Minnesota State Commissioner of Administration, and the Minnesota State Commissioner of Finance. They appeal from four orders of the district court entered in 1976, which are based upon earlier findings and an earlier order determining that unconstitutional practices and conditions existed at the Cambridge State Hospital, an institution for mentally retarded persons, located some forty miles north of Minneapolis and St. Paul, and directing that affirmative steps be taken to bring the institution up to a standard of constitutional acceptability.
 
 
 2
 More specifically, the defendants complain principally of an order entered by the district court on April 15, 1976 which imposed requirements in addition to those imposed by the district court's underlying order of October 1, 1974, and of an order entered on July 28, 1976 which in effect enjoined the Commissioner of Administration and the Commissioner of Finance from complying with a Minnesota constitutional provision and Minnesota statutes which stand in the way of the Department of Public Welfare in attempting to comply with the requirements of the district court.
 
 
 3
 Defendants also appeal from an order entered on March 30, 1976 which struck from the record certain evidence tendered by the defendants in the course of hearings conducted by the district court in November and December, 1975 after the plaintiffs had filed a Supplemental Complaint in June of that year, and from that part of an order entered on May 19, 1976 which denied the defendants' motion to dismiss the Supplemental Complaint.
 
 
 4
 We affirm the district court's order of March 30 and the portion of the order of May 19, 1976 from which defendants appeal. We also affirm the order of April 15, 1976. We vacate the order of July 28 and remand the case for further consideration after the Minnesota Legislature has concluded its current session which is now in progress.
 
 
 5
 We observe that the litigation has attracted interest outside Minnesota, and we have been favored with a number of amicus curiae briefs to which due consideration has been given.
 
 
 6
 * In addition to the Cambridge State Hospital, the State of Minnesota owns and operates five other hospitals for the care and treatment of mentally retarded persons.[2] The other hospitals are the Brainerd State Hospital, the Faribault State Hospital, and Hastings State Hospital, the Moose Lake State Hospital, and the Northwest Achievement Center at the Fergus Falls State Hospital.[3]
 
 
 7
 This litigation was commenced in 1972 as a class action brought by residents of the respective hospitals, who sued by their natural guardians and next friends. All of the plaintiffs and the members of the class represented by them were committed to the institutions by Minnesota courts pursuant to the provisions of the Minnesota Hospitalization and Commitment Act, M.S.A. §§ 253A.01 et seq.
 
 
 8
 From an early stage, the controversy centered on conditions and practices at the Cambridge institution, and the district court defined a sub-class of plaintiffs consisting of residents of that institution, which is the only one immediately involved in these appeals.
 
 
 9
 The plaintiffs claimed for themselves and for members of their class that practices and conditions at the respective institutions were such that residents were being denied rights guaranteed to them not only by the laws of Minnesota but also by the fourteenth amendment to the Constitution of the United States, including its incorporation of the eighth amendment which prohibits cruel and unusual punishments. Plaintiffs sought declaratory and injunctive relief. Federal subject matter jurisdiction, which is established, was predicated upon 42 U.S.C. § 1983 read in connection with 28 U.S.C. § 1343(3).
 
 
 10
 The original defendants were the Commissioner of the Public Welfare Department and the Administrators of the several hospitals that have been identified, including Dr. Dale Offerman, the Administrator of the Cambridge institution. The State Commissioners of Administration and Finance did not come into the case until plaintiffs filed their Supplemental Complaint in 1975.
 
 
 11
 The district court held a twelve day trial in late 1973 in which much evidence, including expert testimony, was received. On February 15, 1974 the district court filed a long memorandum opinion amounting to a declaratory judgment; however, at that time the district court did not make any specific findings of fact or enter any order granting or denying specific relief. Welsch v. Likins, 373 F.Supp. 487 (D.Minn.1974).[4]
 
 
 12
 The 1974 opinion of the district court that has just been mentioned includes a scholarly discussion of the constitutional rights of mentally retarded persons who are judicially committed to state institutions. We can add nothing of substance to that opinion.
 
 
 13
 The district court found generally that at least most mentally retarded persons can profit to some extent from treatment and can improve their unfortunate situation provided that their treatment is proper and is administered systematically and by qualified people.[5]
 
 
 14
 The district court held as a matter of law that apart from any right to treatment mandated by state statutes, mental retardees committed to state institutions without their consent have a federal constitutional right to treatment. The district court also held as a matter of law that retardees are constitutionally entitled to the benefit of the least restrictive environment consistent with their needs and conditions, and that they are constitutionally entitled not to be subjected to cruel and unusual punishments prohibited by the eighth amendment as carried forward into the fourteenth amendment.
 
 
 15
 A further hearing was conducted in May, 1974, and on October 1, 1974 the district court filed full findings of fact and conclusions of law, amounting to an opinion, and entered a comprehensive injunctive order. That opinion and that order were limited to the Cambridge State Hospital, and the order has been referred to in the record as the Cambridge Order.
 
 
 16
 While the district court found that Cambridge was not in any sense a "snake pit" institution, it did find that serious deficiencies amounting to constitutional deprivations existed, and that they had to be remedied.
 
 
 17
 It was found that the physical plant at Cambridge was deficient in a number of respects, that the treatment program was inadequate, and that the institution was seriously understaffed as far as providing adequate habilitation for residents was concerned.
 
 
 18
 The district court also found that in instances residents were subjected, albeit not maliciously or vindictively, to what amounted to cruel and unusual punishments. The trial judge was concerned with the practice of controlling undesirable behavior by placing residents in a form of solitary confinement known as "seclusion," by the use of physical restraining devices, and by the indiscriminate use of tranquilizing and behavior controlling drugs.
 
 
 19
 Appendix A to the Cambridge Order includes twenty-seven specific requirements and prohibitions. The district court required improvements in physical plant, including the air conditioning and carpeting of certain facilities, and it also undertook to limit and regulate the use of seclusion and restraining devices and the use of drugs in the control of resident behavior. Perhaps most importantly, the district court also made detailed staffing requirements, compliance with which required the Department of Welfare to employ numerous additional personnel.
 
 
 20
 Jurisdiction of the case for appropriate purposes was retained.
 
 
 21
 The defendants have never quarreled with the legal declarations contained in the February, 1974 opinion of the district court, and indeed have never quarreled with the requirements of the Cambridge Order from which the defendants did not appeal. We accept those declarations and requirements as the starting point of our inquiry into the propriety of the 1976 orders from which the defendants do appeal.[6]
 
 II
 
 22
 It was recognized by all concerned, including the trial judge, that compliance with the Cambridge Order would require that funds be provided to the department of Public Welfare over and above what the Minnesota Legislature would normally be expected to appropriate for the operation of the Cambridge institution. And the defendants were directed to seek necessary funding through regular administrative and legislative channels; the defendants did so.
 
 
 23
 Had the Legislature responded with an appropriation sufficient to enable the defendants to comply with the Cambridge Order fully, this case would probably not be here. Unfortunately, for one or more reasons the legislative response was inadequate, and the defendants were not able to comply fully with the requirements of the district court, although they undertook to comply in good faith to the best of their ability and were able to comply in many respects.
 
 
 24
 In June, 1975 the plaintiffs filed a Supplemental Complaint. In that pleading they sought modifications of the Cambridge Order. They also sought to have devoted to the Cambridge institution some $4,000,000.00 that the State had received or was due to receive under the federal Medicaid program as reimbursement for State expenditures at Cambridge. In addition, the plaintiffs brought into the case as defendants the State Commissioners of Administration and Finance and sought to enjoin them from enforcing, as far as Cambridge was concerned, the provision of the Minnesota Constitution which prohibits expenditures of public funds except upon legal appropriations, and certain Minnesota statutes relating to the control of the State's fiscal affairs. In connection with that particular prayer for relief plaintiffs asked that a statutory court of three judges be convened pursuant to the provisions of 28 U.S.C. § 2281, which was then in force.
 
 
 25
 The defendants, including the new defendants, moved to dismiss the Supplemental Complaint in its entirety. The defendants also asked for some modifications of their own with respect to the Cambridge Order. Full evidentiary hearings were conducted in November and December, 1975.
 
 
 26
 The district court did not undertake to deal in one order with all of the issues raised in connection with the Supplemental Complaint. That court's dispositions of those issues are reflected in four separate orders entered in 1976, which orders are the subject of these appeals. In connection with each of the four orders the district court made necessary findings, drew necessary conclusions, and stated its views in memorandum opinions.
 
 
 27
 The first order with which we are concerned was entered on March 30, 1976. That order struck from the record as irrelevant certain evidence that had been introduced by the defendants for the purpose of showing that the facilities and treatment provided by Minnesota for mentally retarded persons compare favorably with those provided by seven other midwestern states.
 
 
 28
 Much more important was the order entered on April 15, 1976. In that order and in the findings and conclusions on which it was based the district court determined that a great deal of progress had been made at Cambridge since the entry of the order of October 1, 1974. The court also found, however, that while the defendants had been able to comply with a number of the requirements of the earlier order, they had failed to comply with other requirements, and it was further found that modifications of the earlier order were necessary.
 
 
 29
 As far as the modifications set out in the April 15 order are concerned, it is sufficient for present purposes to say that they placed some stringent personnel and other requirements on the defendants which were additional to the requirements contained in the October, 1974 order.
 
 
 30
 The third order was entered on May 19, 1976. By it the district court refused to dismiss the Supplemental Complaint; it denied the prayer of the plaintiffs with respect to the Medicaid funds, and it refused to convene a three judge court to deal with plaintiffs' prayer for an injunction against the Commissioner of Administration and the Commissioner of Finance.
 
 
 31
 Finally, on July 28, 1976 the district court entered its most controversial order in the case. It found that it had the authority to enjoin the enforcement of the relevant Minnesota constitutional provision and fiscal control statutes, that there was no lack of necessary parties defendant, and that the injunction sought by the plaintiffs was necessary and should be issued. It was issued, but its operation was stayed pending appeal.
 
 
 32
 Defendants appeal from the order of March 30, 1976, from the portions of the order of April 15, 1976 adverse to them, from that part of the order of May 19, which denied defendants' motion to dismiss the Supplemental Complaint, and from the order of July 28.
 
 
 33
 Plaintiffs have not cross appealed.
 
 III
 
 34
 In this section of this opinion, we will deal with defendants' appeal from the order of March 30, 1976 and from part of the order of May 19 of that year.
 
 
 35
 As has been stated, the evidence introduced by the defendants was designed to show, and we will assume that it did show, that Minnesota institutions for the mentally retarded, including Cambridge, are as good as or perhaps better than comparable institutions in other midwestern states.
 
 
 36
 The district court received the evidence tentatively subject to plaintiffs' objections to it and motion to strike it, and later granted the motion to strike. The district court did not consider that the evidence was relevant since there was no showing that the institutions of the other states involved were in fact constitutional, or that those states had achieved or were working toward the proper habilitation of residents which the district court considered to be constitutionally required. From the opinion of the district court it is clear that the trial judge in fact considered the evidence but simply did not think that it was entitled to be given any weight.
 
 
 37
 No one claims that a state agency can defend one of its institutions against a charge of unconstitutionality simply by showing that it is no more unconstitutional than are comparable institutions in other states, or that it is as good as or better than comparable institutions elsewhere. See Holt v. Sarver, 300 F.Supp. 825, 828 (E.D.Ark.1969).
 
 
 38
 It does not necessarily follow, however, that evidence based on comparisons between institutions is totally without probative value in a case of this kind, and we are not sure that the probative value of the evidence is limited to situations in which the evidence shows that the institution in question is substandard.
 
 
 39
 Hence, we are troubled by the action of the district court in striking the evidence of the defendants from the record. However, questions of admissibility of evidence and of the weight to be given to particular items of evidence address themselves primarily to the discretion of the trial court. Moreover, when the evidence in question is considered in the light of the whole body of evidence in the case we do not think that it was sufficiently important to require us to characterize the error, if any, of the district court in striking it as reversible error.
 
 
 40
 The appeal from that part of the order of May 19 which denied defendants' motion to dismiss the Supplemental Complaint need not detain us long. That pleading contained a number of prayers for relief, and defendants were certainly not entitled to have it summarily dismissed in toto. In one respect the order in question was favorable to the defendants. The legal position of the defendants in connection with the injunction against the Commissioners of Administration and Finance is adequately preserved in the appeal that the defendants have taken from the order of July 28, 1976, which will be considered in due course.
 
 IV
 
 41
 In attacking the order of April 15, 1976 the defendants do not argue, nor could they argue successfully, that a federal district court acting within the framework of a suit brought under 42 U.S.C. § 1983 does not have the power to correct unconstitutionalities by means of an injunction and to include in its decree affirmative requirements which may be onerous and which may require the expenditure of public money that otherwise would not have been spent or would have been spent for something else.
 
 
 42
 The power of a district court to impose standards with respect to a mental institution was expressly recognized in Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. 1974). The United States District Court for the Eastern District of Arkansas and this court have imposed affirmative requirements as well as prohibitions on the Arkansas Department of Correction which have cost the State of Arkansas vast amounts of money. See Finney v. Hutto, 410 F.Supp. 251 (E.D.Ark.1976), aff'd on partial appeal, 548 F.2d 740 (8th Cir. 1977); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971). See also Finney v. Arkansas Board of Correction, 505 F.2d 194 (8th Cir. 1974), reversing in part Holt v. Hutto, 363 F.Supp. 194 (E.D.Ark.1973). And, of course, requirements that have been made by this court and by other courts in cases involving the racial integration of public schools are not to be overlooked.
 
 
 43
 The defendants earnestly contend, however, that the additional requirements imposed by the order of April 15, and particularly the personnel or staffing requirements, were so unreasonable, unnecessary and burdensome that the impositions amounted not only to an abuse of judicial discretion but also to a violation of the underlying concept of federalism recently emphasized in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).
 
 
 44
 With regard to the staffing requirements of the April 15 order, counsel for the defendants say that compliance with those requirements would cost the State some two million dollars a year for Cambridge alone, and that if the requirements were extended to the other state hospitals that have been mentioned, the cost of compliance could run to as much as ten or twelve million dollars annually. And counsel argue that the defendants "substantially complied" with the October, 1974 order, and that more should not have been required of them.
 
 
 45
 It is not our function to try the case de novo. This is an appellate court. We are required to accept the factual findings of the district court unless clearly erroneous, and we think that great deference should be paid to the district court's exercise of its judgment and discretion in a case with which it has a high degree of familiarity.
 
 
 46
 The question of whether additional requirements should be imposed on the defendants with respect to Cambridge, and, if so, what those requirements should be, was fully threshed out before an able, experienced and conscientious trial judge who by the spring of 1976 had acquired approximately four years of experience with the Cambridge State Hospital, with its facilities and programs, and with its staffing problems. Manifestly, he thought in 1976 that additional requirements had to be made, and we are satisfied that he was convinced that the particular requirements that were made were necessary to eliminate the constitutional deprivations under which the residents had been laboring.
 
 
 47
 We are not prepared to say that the district court erred in finding that additional requirements were necessary, and we are unwilling to disturb the particular requirements that were made.
 
 
 48
 The April 15, 1976 order of the district court will be upheld.
 
 V
 
 49
 The order of July 28, 1976 enjoined Commissioner of Administration Brubacher and Commissioner of Finance Christianson and their subordinates and successors "from enforcing or attempting to enforce any provision of State law which, if implemented or enforced, would cause the defendants Likins and Offerman, their successors in office, agents, employees, and all persons in active concert or participation with them, to be unable to comply with this Court's Orders dated October 1, 1974, and April 15, 1976." The order then went on to list specifically Article XI, § 1 of the Constitution of Minnesota, and eleven specific statutory provisions, enforcement of which was enjoined.
 
 
 50
 The obvious purpose of the order was to permit the Department of Public Welfare to comply with the earlier orders of the district court just as though the Minnesota Legislature had made appropriations adequate to permit compliance in accordance with normal Minnesota fiscal procedures. To put it bluntly, the order seems designed to short circuit ordinary legislative and administrative processes involving the expenditure of state funds. We will assume that the order, if upheld, would accomplish that purpose.
 
 
 51
 In attacking the order the defendants contend that it was not only an abuse of judicial discretion but also that it was positively forbidden by the eleventh amendment to the Constitution of the United States[7] and was contrary to the philosophy expressed in Rizzo v. Goode, supra.
 
 
 52
 Defendants' challenge to the July 28 order presents two threshold questions: (1) Did the district court sitting alone have power to enjoin enforcement of Minnesota Constitution Article XI, § 1, and the Minnesota statutes in question in view of the three judge court requirement of 28 U.S.C. § 2281? (2) If so, were proper parties defendant before the district court? The district court answered both questions in the affirmative.
 
 
 53
 Section 2281, which was repealed shortly after the district court entered its order by the Act of August 12, 1976, P.L. 94-381, 90 Stat. 1119, read in connection with § 2284, provided that a district court of three judges, including a United States circuit judge, had to be convened in any case in which an injunction was sought against the enforcement of a state statute on the ground that the statute was repugnant to the Constitution of the United States. And, as has been seen, the plaintiffs requested the district court to cause a statutory court to be convened.
 
 
 54
 Section 2281 was still in force when the order of July 28, 1976 was entered and it was jurisdictional. It is not clear to us whether the Act of August 12, 1976 should be applied retroactively so as to validate an injunction issued by a single judge which would have been invalid had § 2281 remained in force. For that reason we consider it desirable to consider briefly the correctness of the district court's conclusion that a three judge court was unnecessary.
 
 
 55
 It is obvious that the Minnesota constitutional and statutory provisions involved here are not in themselves unconstitutional, nor are they unconstitutional as applied in general to Minnesota institutions including mental institutions; indeed, they are salutary. The district court did not enjoin enforcement of the laws in question on the basis of unconstitutionality but simply on the ground that they stood as innocent impediments to compliance with the court's decrees in the absence of adequate funding of such compliance by the Legislature.
 
 
 56
 In such circumstances the district court did not consider a three judge court to be necessary, and we agree with that conclusion. Cf. Phillips v. United States, 312 U.S. 246, 252-54, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 84 L.Ed. 1249 (1940); United States v. Missouri, 515 F.2d 1365, 1372 (8th Cir.), cert. denied,423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); Carter v. Gallagher,452 F.2d 315 (8th Cir.), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).
 
 
 57
 As to parties defendant, it will have been observed that the plaintiffs did not name the Governor of Minnesota as a party defendant nor did they bring into the case the members of the Minnesota Legislature, although we note that the members of the Legislature have joined with the State of South Dakota in filing a joint amicus curiae brief.
 
 
 58
 The Governor and the members of the Legislature could have been made parties to the suit, and the question of whether they should have been joined is governed by Fed.R.Civ.P. 19(a). The State itself could not have been made a party without its consent; however, we do not consider that the State, as such, is an indispensable party.
 
 In pertinent part, Rule 19(a) provides:
 
 59
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. . . .
 
 
 60
 On this phase of the case the district court found:
 
 
 61
 Defendants Brubacher and Christianson are, respectively, the Commissioner of Administration and the Commissioner of Finance of the State of Minnesota, whose duties are set forth in chapters 16 and 16A of the Minnesota Statutes and in other provisions of Minnesota law such as appropriations acts, which are not codified as part of the Minnesota Statutes. Pursuant to these provisions, it is the responsibility of the defendants Brubacher and Christianson, inter alia, to enforce the fiscal and complement control provisions of Minnesota law specified in paragraph 1 of the following Order.
 
 
 62
 This Court finds that effective relief can be provided the plaintiffs in this case without addition of any other parties, including the Governor of the State of Minnesota, any members of the legislature, and any law enforcement officials of the State of Minnesota. Failure to join any such persons as parties to this action will not as a practical matter and in the context of the Order issued herewith subject any of the defendants to a substantial risk of incurring multiple or differing obligations which could not be cured by further Order of this Court. Nor will failure to join such persons impair or impede their ability to protect any interest in the matter claimed by them.
 
 
 63
 The absence of the Governor and the Legislature as parties of record does not appear to us to create any problem since the State's interest in the enforcement of its fiscal laws would appear to be adequately represented by the Commissioners of Administration and Finance, respectively. Both the Commissioner of Administration and the Commissioner of Finance are department heads in the Executive Branch of the government of Minnesota, and both are gubernatorial appointees with their appointments being subject to Senate confirmation. M.S.A. §§ 16.01 and 16A.01.
 
 
 64
 In any event since we have determined to vacate the Order of July 28, and to remand the entire case for further consideration after the Legislature adjourns, we find it unnecessary to pass upon the question of sufficiency of parties at this time.
 
 
 65
 What has been said to this point brings us to the merits of the controversy about the July 28 Order. The controversy is a serious one, and the legal questions presented are difficult, as the district court conceded. Apart from any questions of judicial discretion, the controversy raises the more fundamental question of whether the district court had the constitutional power to order administrative officers of the State to by-pass legally imposed restrictions on expenditures by disregarding the state laws imposing those restrictions.
 
 
 66
 In connection with the July 28 Order as in connection with the April 15 Order, the defendants lean heavily on Rizzo v. Goode, supra. That case did not, in our opinion, state any new law that is helpful in present context. It simply emphasized the settled proposition that under our federal system of government the federal courts should be most reluctant to interfere in local governmental affairs and should do so only where the case is clear and the need for federal interference urgent.
 
 
 67
 That consideration is perhaps more important here than it was in Rizzo, which involved the internal administration of the police department of the City of Philadelphia. In this case we are dealing with the right of a sovereign state to manage and control its own financial affairs. No right of a state is entitled to greater respect by the federal courts than the state's right to determine how revenues should be raised and how and for what purposes public funds should be expended.
 
 
 68
 Conflicts between federal judicial power and state and local governments have arisen in the past and will doubtless arise again. But needless direct confrontations between a federal court and a state should be avoided, particularly in a field as delicate as the one here involved.
 
 
 69
 If Minnesota chooses to operate hospitals for the mentally retarded, the operation must meet minimal constitutional standards, and that obligation may not be permitted to yield to financial considerations. As Mr. Justice (then Circuit Judge) Blackmun of Minnesota said a number of years ago in another context, "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . .." Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968).
 
 
 70
 There must be no mistake in the matter. The obligation of the defendants to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what the defendants may be able to accomplish with means available to them. As stated, if Minnesota is going to operate institutions like Cambridge, their operation is going to have to be consistent with the Constitution of the United States. Cf. Holt v. Sarver, supra, 309 F.Supp. at 385.
 
 
 71
 Alternatives to the operation of the existing state hospital system, including Cambridge, may appear undesirable, but alternatives do exist.[8] Primarily, it is the function of the state to determine whether it is going to operate a system of hospitals which comply with constitutional standards, and, if so, what kind of a hospital system it is going to operate. And it is the function of the federal court to determine whether the plans and steps taken or proposed by the state satisfy constitutional requirements. We think that all concerned would do well to keep that difference in function in mind.
 
 
 72
 We do not know why the Legislature that met in 1975 failed to respond more positively to the 1974 requirements of the district court. It is possible that the then Governor and the Legislature did not fully appreciate the force of those requirements; or the Governor and the Legislature may have thought that there was a better way to reach the objectives that the district court thought must be achieved.
 
 
 73
 In any event, we desire to make it clear to the present Governor and the current Legislature that the requirements of the 1974 Order and the requirements of the April 15, 1976 Order that we uphold today are positive, constitutional requirements, and cannot be ignored. We will not presume that they will be ignored. On the contrary, we think that experience has shown that when governors and state legislatures see clearly what their constitutional duty is with respect to state institutions and realize that the duty must be discharged, they are willing to take necessary steps, including the appropriation of necessary funds.
 
 
 74
 There is no suggestion that Minnesota lacks the funds necessary to enable the Department of Public Welfare to meet the requirements of the district court. The question is what priority the Legislature, in the face of competing demands for state funds, is willing to accord to its institutions for the mentally retarded. We think that the Legislature should have a chance to answer that question between now and the end of the current session.
 
 
 75
 We vacate the district court's Order of July 28, 1976 and remand the whole case to the district court for further consideration after the current Legislature has completed its session. Depending on legislative response to the needs of Cambridge and the other hospitals, the district court may consider that its requirements should be modified in certain respects or that time schedules for compliance with the requirements should be altered. Or the district court may deem it necessary to adhere to present requirements.
 
 
 76
 On remand, the district court will have full jurisdiction of the case for all appropriate purposes.
 
 
 77
 Subject to the foregoing discussion, we affirm the Orders of the district court entered on March 30, April 15, and May 19, 1976. We vacate the Order of July 28, 1976 and remand the case for further proceedings not inconsistent with this opinion.
 
 
 
 *
 ROY W. HARPER, Senior District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Earl R. Larson, United States District Judge
 
 
 [2]
 A mentally retarded person, as contrasted to a person who is mentally ill, suffers from a lack of mental capacity or development. The existence and degree of mental retardation of a person is measured by reference to his achievements on standard I.Q. tests. Four degrees of retardation are recognized: mild, moderate, severe, and profound. Mentally retarded persons frequently suffer also from severe physical impairments and disabilities. Some have severe emotional and behavioral problems as well
 
 
 [3]
 In addition to the institutions that have been mentioned, Minnesota operates institutions for the mentally ill and chemically dependent
 
 
 [4]
 Although the district court filed a number of later opinions in the case, the one just cited is the only one dealing with the merits of the controversy that was published. The district court did publish a later opinion dealing with a matter of costs, and its ruling in connection with costs at that stage was affirmed by this court. Welsch v. Likins, 68 F.R.D. 589 (D.Minn.), aff'd, 525 F.2d 987 (8th Cir. 1975)
 
 
 [5]
 The institutional treatment of retardees has been referred to in this case as "habilitation." In a later opinion the district court defined that term as being "the process by which a resident is assisted by others at the institution to acquire and maintain skills that enable the resident to cope more effectively with the demands of his own person and of his environment and to raise the level of his physical, mental, behavioral, and social efficiency. Habilitation includes, but is not limited to, formal, structured programs of education and treatment
 
 
 [6]
 It should be said that the constitutional right of a non-criminal committed to a mental institution to be treated for his condition is probably clearer today than it was in February, 1974. While the Supreme Court has not yet held that such a right exists, cf. O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), its existence was recognized in Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. 1974), and in its companion case of Burnham v. Department of Public Welfare, 503 F.2d 1319 (5th Cir. 1974), cert. denied, 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975). Those cases had not been decided when the district court filed its original opinion in this case. However, the district court relied largely on the holding of the district court in Alabama in the Wyatt case and refused to follow the contrary holding of the district court in Georgia in the Burnham case. Moreover, as the district court noted, by early 1974 the course of relevant decisions was clearly trending toward the view that the non-criminal mentally ill or retarded who are confined in state institutions have a constitutional right to reasonable treatment for their illnesses or conditions
 
 
 [7]
 The eleventh amendment provides that the judicial power of the United States shall not extend to any suit in law or equity against any State "by Citizens of another State, or by Citizens or Subjects of any Foreign State." While the amendment does not in terms apply to a suit brought against a State by a citizen of that State, it is well established that the amendment recognizes the doctrine of sovereign immunity of the several States, and that a State cannot be sued in federal court without its consent with the prohibition extending to suits brought by citizens of the defendant State. Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and cases cited
 
 
 [8]
 An extreme alternative would, of course, be the closing of the hospitals and the abandonment by the State of any program of institutional care and treatment for mental retardees. A lesser alternative might be the reduction in the number of hospitals. Or the Legislature and the Governor might decide to reduce by one means or another the populations of the respective institutions to a point where the hospitals would be staffed adequately and adequate treatment could be given to individual residents