Nicholas A. PALMIGIANO et al.,
Plaintiffs-Appellees,

v.

J. Joseph GARRAHY et al.,
Defendants-Appellants.

No. 79–1021.

United States Court of Appeals,
First Circuit.

Argued May 11, 1979.

Decided June 6, 1979.

---

**18**

William G. Brody, Asst. Atty. Gen., Providence, R. I., with whom Dennis J. Roberts, II, Atty. Gen., and Maureen E. McKenna, Sp. Asst. Atty. Gen., Providence, R. I., were on brief, for defendants-appellants.

Matthew L. Myers, Providence, R. I., with whom Alvin J. Bronstein, Washington, D. C., and Robert Mann, Providence, R. I., were on brief, for plaintiffs-appellees.

Before CAMPBELL and BOWNES, Circuit Judges, DEVINE, District Judge.*

BOWNES, Circuit Judge.

This case can best be described as a spin-off from a massive prison case which probed all aspects of the Adult Correctional Institutions of Rhode Island. *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977). The District Court of Rhode Island found that the overall conditions of confinement at the maximum and medium security prisons violated the cruel and unusual punishment proscription of the eighth amendment.

The evidence is overwhelming that the totality of conditions of confinement in Maximum and Medium do not provide the "tolerable living environment", *Rhem v. Malcolm*, 371 F.Supp. 594, 627 (S.D.N.Y.), *aff'd* 507 F.2d 333 (2d Cir. 1974), that the Eighth and Fourteenth Amendments require for state prison inmates. *Compare Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1974); *Holt v. Sarver*, 442 F.2d 304, 308 (8th Cir. 1971); *Mitchell v. Untreiner*, 421 F.Supp. 886, 896 (N.D.Fla. 1976); *Pugh v. Locke*, 406 F.Supp. [318] at 329 (D.C.Ala.); *Hamilton v. Schiro*, 338 F.Supp. 1016, 1019 (E.D.La.1970). The lack of sanitation, lighting, heating and ventilation and the noise, idleness, fear and violence, and the absence or inadequacy of programs of classification, education, physical exercise, vocational training or other constructive activity create a total environment where debilitation is

* Of the District of New Hampshire, sitting by designation.

inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person.

*Id.* at 979.

An extensive order was issued on August 10, 1977, designed to correct the unconstitutional conditions. No appeal was taken from the opinion or order. Paragraph 4.(a)[1] of the order now being challenged by defendants-appellants on the grounds that in its present posture it unconstitutionally invades the fiscal autonomy of the State of Rhode Island, and that, under the constitution and statutes of Rhode Island, the governor is powerless to comply with it.

A review of the "travel"[2] of the order is necessary. All of the necessary facts have been stipulated. The court set a May 10, 1978, deadline for compliance with paragraph 4.(a). The governor included in his budget request of January, 1978, an item for funds to implement the changes he felt were necessary to carry out the order. The amount was a little less than $300,000 ($299,200). This budget item was rejected by the Rhode Island Legislature, which enacted a bill placing the issue of funding necessary to comply with paragraph 4.(a) on a bond referendum. The bond referendum was defeated by the voters at the election on November 7, 1978.[3]

On May 10, 1978, the original compliance date, defendants filed a motion for a six month extension of time. Plaintiffs and defendants exchanged proposals for compliance between May 23, 1978, and July 25, 1978. On August 8, 1978, the court-appointed Master held a conference with all counsel to review the compliance proposals. After reviewing the proposals, the Master appointed a public health expert to inspect the two prisons in question and make a recommendation for compliance. The expert found that both facilities failed to comply with the minimum public health standards required by the August 10, 1977, order. On August 31, 1978, defendants submitted a final compliance proposal.

This proposal was incorporated into the Master's report, which was presented to the district court and all parties on October 6,

---

1. "4.(a) Defendants shall within nine months from the entry of this order, bring each building and facility under their control, particularly but not limited to the housing and food service areas of said buildings and facilities, into compliance with the minimum standards of the United States Public Health Service, the American Public Health Association, and the Department of Health, State of Rhode Island. (The separate compliance requirements for the Maximum Security facility are set forth in paragraph 3(c) above). Implementation of this paragraph 4(a) shall include, but not be limited to, the following:

(1) all facilities shall be adequately heated, lighted and ventilated. Windows and window panes shall be properly maintained and replaced when broken;

(2) each prisoner shall have access to household cleaning implements and supplies;

(3) a regular and effective program of insect and rodent control shall be undertaken;

(4) food shall be stored, prepared and served under sanitary conditions which meet minimum public health standards. Equipment shall be maintained in good working order. Kitchen employees and prisoners shall be adequately trained and supervised;

(5) all trash and debris shall be regularly removed from hallways, cellblocks, corridors and other common areas and trash and debris shall in no circumstances be stored or accumulated in vacant cells;

(6) all toilets, showers and wash basins shall be properly maintained and kept in good repair. Every cell shall be equipped with a working toilet that flushes from inside the cell and with a wash basin with hot and cold running water;

(7) no more than one prisoner shall be confined in any cell which is less than 60 square feet;

(8) every prisoner shall be provided with a clean mattress, which meets with federal fire safety standards, and with clean bed linens, towels and soap;

(9) each convicted prisoner housed in a dormitory shall have at least seventy-five square feet of personal living space and only those prisoners who have been classified as Minimum Security shall be housed in dormitories;

(10) each dormitory shall be equipped with at least one toilet to every 15 prisoners; one urinal or one foot of urinal trough to every 15 prisoners; one shower to every 15 prisoners and one sink to every 10 prisoners. Toilets and urinals shall be kept reasonably clean and in good working order."

2. An indigenous Rhode Island term meaning procedural history.

3. The bond referendum contained a number of funding issues, most of which were defeated.

1978. A hearing on the report was held by the district court on October 6. Defendants asked for and were given an extra week to determine whether they objected to any portion of the report and the proposals incorporated therein. At the second hearing on October 13, 1978, defendants informed the court that they had no specific objection to the Master's report. At the conclusion of the hearing, the district court invited the parties to submit to the Master any ideas for reducing the cost of compliance. No suggestions were made. The court then issued, on November 9, the order which is the subject of this appeal.

The order is tripartite: it first outlines the history of paragraph 4.(a) as recited above; secondly, it sets specific deadlines;[4] and, thirdly, it warns defendants that lack of funds is no excuse for unconstitutional prison conditions. The last two paragraphs of the order state:

> The record in this case demonstrates that the parties have been given every opportunity to account for practical exigencies in the development of an adequate plan for renovating these facilities. There is no legal basis for allowing any further delay.

> Finally, the Master is directed to make findings of fact and recommendations to the Court regarding defendants' compliance as he sees fit. Those findings and recommendations need not be limited to the issue of implementation of this renovation schedule and may address defendants' compliance with paragraph 4.(a) in all respects.

At oral argument, we were informed by counsel for the parties that the Rhode Island Legislature had on May 4, 1979, approved appropriations in the amount of $449,000 for prison repairs and renovations and that LEAA would issue a matching grant. There is, therefore, no longer any dearth of funds or lack of power in the defendant-governor to implement the order.

Defendants insist, however, that the case is not moot and that we declare the order invalid because it was issued with full knowledge that the governor did not have the funds necessary for compliance and was forbidden by the constitution and statutes of Rhode Island from ordering repairs and renovations without the requisite funding.[5] Plaintiffs, not surprisingly, assert that the order is perfectly valid and urge us to declare it constitutional.

We do not think the issue is ripe for decision at this time. While the order may have been a preliminary step leading to a classic confrontation between the governor of a state and the United States District Court, such confrontation is still in the mind of the beholder. The order carries no sanctions and expressly directs the Master "to make findings of fact and recommendations to the Court regarding defendants' compliance as he sees fit." This is far different from the order in *Welsch v. Likins*, 550 F.2d 1122 (8th Cir. 1977), on which defendants rely. There, the court found that it had authority to enjoin the enforcement of the Minnesota constitutional provision and fiscal control statutes. No such authority has been asserted here and no injunction has been issued. In vacating and remanding for further consideration, the court in *Welsch* expressly noted:

---

**4.** The "B" building deadlines were April 1, 1979, for "phase 1" of the Master's schedule and September 1, 1979, for "phase 2." The Medium Security building deadlines were June 1, 1979, and November 1, 1979.

**5.** Article XXXI § 1 of the Rhode Island Constitution provides:

> *Borrowing power of general assembly.* —The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with this state by the government of the United States.

R.I.Gen.Laws § 35–3–2 provides:

> *Annual appropriations for state government.* —The general assembly shall annually appropriate such sums as it may deem necessary to pay the administrative and other expenses of the state government.

Conflicts between federal judicial power and state and local governments have arisen in the past and will doubtless arise again. But needless direct confrontations between a federal court and a state should be avoided, particularly in a field as delicate as the one here involved. *Id.* at 1132. This is salutary advice.

It now appears that, unlike the situation which faced the court in *Inmates of Suffolk County Jail v. Kearney*, 573 F.2d 98, 101 (1st Cir. 1978), the unconstitutional conditions will not continue interminably at the two Rhode Island prisons. Since this appeal has had the effect of postponing the April and June deadlines for compliance, we remand for further consideration by the district court in light of the most recent developments.

*So ordered.*