**William DAVIS, et al., Plaintiffs,**

v.

**Richard BUCKLEY, et al., Defendants.**

**Civ. A. No. 80–0569–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 17, 1981.

Donald H. Stone, Eugene Murphy, Neighborhood Legal Aid Society, Inc., Richmond, Va., James Hanagan, Peninsula Legal Aid Center, Williamsburg, Va., for plaintiffs.

Lewis F. Powell, III, Richmond, Va., Joel I. Klein, Washington, D.C., for opposing intervenors.

Mary Yancey Spencer, Asst. Atty. Gen., Richmond, Va., for Richard Buckley, Leo Kirven, Jr., and Merritt W. Foster, Jr.

James E. Ryan, Jr., Asst. Atty. Gen., Richmond, Va., for Jean L. Harris.

John A. Rupp, Asst. Atty. Gen., Richmond, Va., for William Lukhard and E. B. Pendleton.

John R. Haymes, Jr., Asst. City Atty., Richmond, Va., for Thomas Hogan, William F. Hellmut, City of Richmond and Donald K. Bruce.

## MEMORANDUM

MERHIGE, District Judge.

This is an action by two named plaintiffs brought on behalf of the class (not yet certified) of all mentally retarded residents of Southside Virginia Training Center ("Southside") who are ready for community placement, seeking declaratory and injunctive relief requiring the defendants to provide them with residential placements and social, educational and rehabilitative programs in their communities.

In their second amended complaint, filed on August 17, 1981 pursuant to the Court's order of that date, plaintiffs rest their claims to relief on Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, the due process and equal protection clauses of the Fourteenth Amendment, The Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. § 794, Va.Code § 37.1–84.1 and Va. Code § 37.1–98.

The class of plaintiffs is said to be composed of those 98 persons currently housed in Southside who have been identified as ready for release into the community.

Named defendants include several state officials associated with Virginia's mental health and public welfare agencies, the Governor of Virginia, and mental health and welfare officials of the City of Richmond. The Richmond officials are sued as representatives of an asserted class of defendants which includes all communities and their officials charged with any duties and obligations with respect to mentally retarded persons in the various communities served by Southside.

Plaintiffs claim that none of these communities has developed appropriate residential placement or educational, vocational, habilitation and other programs for members of the plaintiff class. Plaintiffs also assert that they are not provided adequate preparation for release at Southside, and that the personnel, therapy, recreational, self-help and social skills training programs, medical and dental care, as well as the facilities at Southside are defective and inadequate.

The present motions to dismiss by several defendants [1] are brought on a number of grounds, which fall within two general categories:

(1) substantive arguments

(2) lack of authority arguments.

For the reasons which follow, the Court is of the view that the motions must be denied.

## I. *Substantive Arguments*

### A. Habeas Corpus Argument:

■ Defendants contend that plaintiffs' claim is one seeking release from custody and placement in the community, and, as a challenge to the fact or duration of their confinement, must be brought only through a petition for writ of habeas corpus. *See Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In a habeas action, plaintiffs would be required to exhaust their state remedies before bringing this action.

■ In the Court's view, however, defendants mischaracterize plaintiffs' claims and the nature of the relief sought. The essence of plaintiffs' claims is not that they are being "unlawfully subjected to physical restraint," [2] but that the Constitution and federal and state law entitle them to certain levels of treatment and habilitation. The declaratory and injunctive relief sought in order to require defendants to provide such treatment, one phase of which includes appropriate residential placements, goes well beyond the release from physical custody sought in a habeas action. The injunctive relief ordered in similar suits by retarded or mentally ill citizens against state officials has been extensive, and has included orders concerning staffing, individualized treatment programs, recreation and institutional organization. *See Welsch v. Likins*, 373 F.Supp. 487 (D.Minn.1974), *aff'd. in part and vacated in part*, 550 F.2d 1122 (8th Cir. 1977); *Wyatt v. Stickney*, 325 F.Supp. 781 (D.Ala.1971), *aff'd.* 503 F.2d 1305 (5th Cir. 1974); *New York Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 757 (E.D.N.Y.1973). If any comparison is to be drawn between a prisoner suit and the instant action, it is certainly closer to a suit challenging the conditions of confinement than to a habeas action. Such challenges are proper subjects of a § 1983 action. *Derrow v. Shields*, 482 F.Supp. 1144 (W.D.Va. 1980). *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

### B. The State Law Claims:

Plaintiffs claim that the defendants' failure to provide community placements and rehabilitative programs constitutes a violation of Va.Code § 37.1–84.1, which requires that patients or residents in facilities operated, funded or licensed by the state's Department of Mental Health and Mental Retardation be treated "under the least restrictive conditions consistent with [their] condition and not be subjected to unnecessary physical restraint or isolation."

Defendants argue that this statute does not give rise to the entitlements claimed by the plaintiffs.

The content of the duties imposed on state officials by § 37.1–84.1 is not clear. It seems reasonable to suggest that the "least restrictive alternative" would require community placements where warranted. The Department of Mental Health and Mental Retardation has declared its commitment to the "development of a comprehensive continuation of services which will provide viable alternatives to institutionalization for

---

1. The defendants involved in these motions are: William F. Lukhard, Commissioner of the Virginia Department of Welfare; Eugene B. Pendleton, Jr., Chairman of the Virginia State Board of Welfare; Thomas W. Hogan, Director of Public Welfare for the City of Richmond; Margaret Foley, Director of the Richmond City Department of Mental Health and Mental Retardation and Executive Director of the Richmond Community Mental Health and Mental Retardation Services Board; William F. Hellmut, Chairman of the Richmond Advisory Board of Public Welfare; Donald K. Bruce, Chairman of the Richmond Community Mental Health and Mental Retardation Services Board; and the City of Richmond.

2. *Preiser v. Rodriguez*, 411 U.S. 475, 486, 93 S.Ct. 1827, 1834, 36 L.Ed.2d 439 (1973).

Virginia's mentally retarded citizens and their families," with emphasis on "community-based alternatives to institutionalization." [3] Also, § 37.1–84.1(1) provides that the patient retains his legal rights under federal laws, which may require the remedies plaintiffs seek. Defendants' motion to dismiss this claim is not well taken.

▇ Defendants also argue that, before bringing this action, plaintiffs must first exhaust their remedies before the human rights committee at their institution. The Court sees little merit in this position. Defendants present no authority for this assertion and there is no indication that pursuit of such procedure would be effective in achieving the relief plaintiffs seek.

▇ Plaintiffs also claim that defendants have failed to provide the appropriate residential and social services required by Va.Code § 37.1–98. That section provides that the director of a state hospital may discharge a patient who is not a proper case for treatment in the institution, and calls for provision of "social services" to discharged persons by local public welfare agencies. The content of these services is not well defined. Defendants maintain that they are limited to whatever programs are currently provided to those discharged. This is an insufficient ground for dismissal. Plaintiffs in this action seek a declaration as to what placement and rehabilitative programs are required by the Constitution and other federal laws. Such programs would certainly be part of the pre-discharge plan and post-discharge care mandated by § 37.1–98.

### C. The Rehabilitation Act:

▇ Plaintiffs claim that defendants have failed to comply with the prohibition of discrimination by reason of a handicap in any program receiving federal financial assistance, found in § 504 of the Rehabilitation Act, 29 U.S.C. § 794, by segregating plaintiffs from contact with any but other mentally retarded citizens and denying them access to services and opportunities available to the non-handicapped.

Defendants contend that this claim is barred by plaintiffs' failure to exhaust their administrative remedies. The Court disagrees with this argument.

The regulations under § 504 of the Rehabilitation Act, 45 C.F.R. § 84.61, adopt the enforcement procedures of Title VI of the Civil Rights Act of 1964, found in 45 C.F.R. §§ 80.6–90.10. The same procedures apply to proceedings brought to enforce § 901(a) of Title IX, which prohibits discrimination in any education program receiving federal aid. 45 C.F.R. § 86.71.

Defendants' argument that exhaustion of administrative remedies is required of a private litigant before he may seek judicial relief under the Rehabilitation Act holds little weight after the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). There, the Court held that a private right of action impliedly existed under Title IX. It further concluded that exhaustion of administrative remedies was not a prerequisite to the bringing of such a suit. 441 U.S. at 706–08 n.41, 99 S.Ct. at 1962–63 n.41. Subsequent court decisions have applied this rule to private actions under § 504 of the Rehabilitation Act, where the enforcement regulations are the same. *Kling v. County of Los Angeles*, 633 F.2d 876 (9th Cir. 1980); *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), *vacated in other respects*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Medley v. Ginsberg*, 492 F.Supp. 1294 (S.D.W.Va.1980). The rationale behind this rule, as stated by the *Camenisch* court, is as follows:

> It is clear why the Supreme Court reached the result it did in *Cannon*. The administrative enforcement process, established by Congress as a part of Title VI, centers entirely on the question of whether, in light of the policies and practices of a recipient of federal assistance,

---

**3.** Virginia Comprehensive Mental Retardation Services Plan for Fiscal Years Ending 1978– 1982, at 24.

federal funds should continue to flow to that recipient. It is predicated upon the need by the Secretary to monitor and enforce the nondiscrimination provisions of agreements between HEW and the recipients of federal assistance. *See* 45 C.F.R. §§ 80.8–80.9 (1979). The purpose of the administrative framework is to provide a forum in which to initiate fund termination proceedings in the event a grant recipient fails to meet its obligations. It is not intended to provide a forum for program beneficiaries to press claims of discrimination against grant recipients. *See* 45 C.F.R. §§ 80.8(a), 80.-10(f) (1979).

The remedy that emerges from such a hearing process is not designed to aid petitioners like Camenisch at all. A decision to terminate funding of a non-complying recipient could work to the disadvantage of a complainant like Camenisch since such a cut-off could guarantee that no further services accrue to the complaining party. There is no specific vindication of personal rights within the HEW administrative procedure for complaining parties like Camenisch.

616 F.2d at 135.

The Court thus concludes that plaintiffs need not invoke the administrative enforcement procedures before bringing this action.

### D. Constitutional Claims:

Plaintiffs claim that defendants have violated their rights to habilitation under the due process clause of the Fourteenth Amendment. They also assert that their segregation from other non-handicapped individuals and lack of access to services and facilities available to those who are not mentally retarded amount to a denial of their equal protection rights under the Fourteenth Amendment.

In the instant motion defendants make no effort to dismiss plaintiffs' equal protection claim. They do assert, however, that there is no constitutional right to treatment in favor of those confined in institutions for the mentally retarded.

Neither the existence of nor the content of a constitutional right to treatment premised on the due process clause is well established. The courts which have found such a right have reasoned that there must be some *quid pro quo* in the form of rehabilitative treatment provided by the state to justify the massive curtailment of individual liberty which accompanies an involuntary civil commitment. Otherwise, the confinement constitutes a denial of due process. This right to treatment thus springs from the deprivation of liberty caused by the commitment. *Romeo v. Youngberg*, 644 F.2d 147 (3rd Cir. 1980), *cert. granted*, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981) (right to habilitation on behalf of the mentally retarded arises when the individual is involuntarily committed, regardless of whether on *parens patria* need for treatment grounds or police power grounds); *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974) (civilly committed mental patients have constitutional right to rehabilitative treatment); *Eckerhart v. Hensley*, 475 F.Supp. 908 (W.D.Mo.1979) (those involuntarily placed in civil commitment have right to such treatment as will give them a reasonable opportunity to be cured or improve their mental condition); *Rone v. Fireman*, 473 F.Supp. 92 (N.D.Ohio 1979) (person involuntarily committed either in whole or in part for the purpose of treatment has due process right to treatment); *Gary W. v. State of Louisiana*, 437 F.Supp. 1209 (E.D. La.1976) (right to the treatment required to achieve the purpose of confinement); *Welsch v. Likins*, 373 F.Supp. 487 (D.Minn. 1974), *aff'd. in part and vacated in part*, 550 F.2d 1122 (8th Cir. 1977).

In *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Supreme Court declined to decide whether a mentally ill person dangerous to himself or to others has a right to treatment when compulsorily confined by a state, or whether a state may require confinement of a nondangerous, mentally ill person for purpose of treatment. The Court did state that a mere finding that an individual is mentally ill does not justify indefinite cus-

todial confinement, and held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." 422 U.S. at 576, 95 S.Ct. at 2494.

The Court of Appeals for the Fourth Circuit has noted in dicta, while finding it unnecessary to express an opinion on the issue of treatment in civil commitment cases:

> [W]e note our fundamental disagreement with the approach taken by the district court in *Burnham [v. Dept. of Public Health of the State of Georgia,* 349 F.Supp. 1335 (N.D.Ga.1972), *rev'd.* 503 F.2d 1319 (5th Cir. 1974), a case which had rejected a constitutionally based right to treatment in the civil commitment setting]. Although courts are ill-equipped to prescribe the techniques of treatment, that does not alter the fact that in many cases treatment is obviously called for and is available in some form. In such cases, the state cannot arbitrarily refuse to provide relief.

*Bowring v. Godwin,* 551 F.2d 44 at 48 n.3.

■ At any rate, this complex issue is not suitable for resolution on the record currently before the Court. It is sufficient for present purposes to say, as did the court in *Scott v. Plante,* 532 F.2d 939 (3rd Cir. 1976), that it does not appear to a certainty that plaintiffs would not be entitled to relief on their right to treatment claim under a state of facts they could prove in support of that claim, and dismissal is improper.

## II. *Lack of Authority Argument*

A. Defendants Lukhard and Pendleton:

■ Pendleton initially argues that he is no longer the chairman of the Virginia State Board of Welfare and should be dismissed. Under F.R.C.P. Rule 25(d)(1), Pendleton's successor, Albert Bailey, is automatically substituted as a defendant in place of Pendleton.[4]

■ Both Pendleton and Lukhard, the Commissioner of the Virginia Department of Welfare, argue that the plaintiffs fail to state a claim against them because they have no authority to make determinations regarding whether individuals should be institutionalized or the operation of the institutions.

Plaintiffs respond that these defendants' lack of authority over institutionalization and discharge decisions, and over the operation of the institutions, does not relieve them of all responsibility for providing the services and facilities which would allow plaintiffs community placement where appropriate and provide them with rehabilitative programs in their communities. The Court agrees.

The present lack of these services and facilities may be as much the result of omissions on the part of these welfare officials as of those of the State Department of Mental Health and Mental Retardation. If plaintiffs eventually prevail on any of their claims, the relief they seek could not be completely provided without the participation of the welfare agencies. The September, 1979 report on Deinstitutionalization and Community Services of the Joint Legislative Audit and Review Committee of the Virginia General Assembly has recognized the need for coordination between the network of agencies with formally defined mental health and mental retardation responsibilities and the group of human service agencies, such as the Department of Welfare, in order to ensure that these persons receive the full range of necessary services. *Id.* at 14. Interagency cooperative service agreements were signed by the Board of Welfare and the Department of Mental Health and Mental Retardation in 1976 and 1979 to delineate their respective responsibilities to persons discharged from state institutions. These defendants' motions to dismiss must be denied.

---

4. For the sake of clarity, all references to the Chairman of the Board of Welfare in this mem-orandum are made in the name of Pendleton.

**B. Defendant Hogan:**

Hogan is the Director of Public Welfare for the City of Richmond. He argues that the extent of his agency's responsibility to any of the plaintiff class is set out in Va. Code § 37.1–98, which makes the provision of social services to patients discharged from state hospitals the duty of local welfare agencies such as Hogan's, as determined by policy approved by the State Board of Welfare. Hogan maintains that under the policy approved by the State Board, his agency has responsibility only to patients who have been discharged and that the policy does not require the provision of any special services to the handicapped.

The Court is of the view that dismissal of Hogan on these grounds would be inappropriate. The cooperative services agreements between the Department of Welfare and the Department of Mental Health and Mental Retardation have called for participation by local welfare agencies in admissions, discharges and pre-discharge planning for patients in state hospitals. The relief plaintiffs seek would not be complete without such participation.

**C. Defendant Hellmut:**

Hellmut is the Chairman of the Richmond Advisory Board of Public Welfare. He argues that he has "no authority or responsibility in respect to the allegations of [the] complaint."

Section 25.3 of the Richmond City Code, implementing the obligations imposed by Va.Code § 63.1–43.1 on local welfare boards, provides that the Advisory Board is to

interest itself in all matters pertaining to the social welfare of the people of the city served by it, shall monitor the formulation and implementation of social welfare programs in the city, shall make recommendations on policy matters concerning the department or division, shall make an annual report to the governing body, concurrent with the budget presentation of the department or division, concerning the administration of the public welfare program, [and] may submit to the governing body, from time to time,

other reports that the advisory body deems appropriate, . . .

Clearly, this means that Hellmut and his Board must participate in the development of community placement plans and of services provided those discharged from state hospitals, if plaintiffs eventually prevail on any of their claims. Otherwise, the Board serves no useful function whatsoever. Hellmut's motion to dismiss will be denied.

**D. Defendants City of Richmond, Foley and Bruce:**

 Foley is the Director of the Richmond Department of Mental Health and Mental Retardation. Bruce is the Chairman of the Richmond Community Mental Health and Mental Retardation Services Board. These defendants cite Va.Code § 37.1–194, which allows the state to make matching grants to cities that establish mental health, mental retardation and substance abuse programs and provides that the State Mental Health and Mental Retardation Board is to determine a core of program services to be provided by local boards by July 2, 1982, and argue that they have yet to receive this program. Defendants contend simply that they have done all they can on their own to provide such services and therefore should be dismissed. This is no ground for dismissal. The city's Department of Mental Health and Mental Retardation Services Board bears the responsibilities under the City Code to develop and provide services for the mentally ill and retarded, as well as residential facilities for them. The fact that these defendants do not presently provide the facilities and services to which plaintiffs claim they are entitled under federal law does not justify their dismissal from an action seeking to obtain these services.