Thomas **ECKERHART** et al., Plaintiffs,

v.

C. Duane **HENSLEY** et al., Defendants.

No. 75 CV 87 C.

United States District Court,
W. D. Missouri, C. D.

Aug. 11, 1979.

Stuart R. Berkowitz, Michael U. Bastian, Legal Aid Society of St. Louis, Ronald L. Carlson, St. Louis, Mo., for plaintiffs.

Wm. F. Arnet, Michael Boicourt, Asst. Attys. Gen., Jefferson City, Mo., for defendants.

## OPINION

ELMO B. HUNTER, District Judge.

This is an action in which plaintiffs seek declaratory and injunctive relief regarding treatment and conditions at Fulton State Hospital, Fulton, Missouri. This case was certified as a class action under F.R.Civ.P. 23(b)(2) on September 16, 1977. Plaintiffs represent "all patients involuntarily confined to the Forensic Unit, Fulton State Hospital, on such date as any judgment may be rendered herein disposing of all allegations raised by the plaintiffs, or any portion thereof." [1]

Defendants are public officials responsible for the supervision and operation of the Forensic Unit and members of the Missouri Mental Health Commission. Named defendants include Dr. C. Duane Hensley, past Director of the Missouri Department of Mental Health and Dr. James K. Ritterbusch, Superintendent of Fulton State Hospital. [2]

The Forensic Unit consists of two residential units, one known as the Marion O. Biggs Building for the Criminally Insane ("Biggs Building") and the other known as the Rehabilitation Unit. The Biggs Building houses patients who, in addition to being mentally ill or mentally disabled, have been deemed to be dangerous to themselves or others to an extent which requires that their care and treatment be conducted under conditions which provide maximum security. The Biggs Building is the only unit of the Missouri Department of Mental Health housing solely maximum security patients. The Rehabilitation Unit also houses patients who have been determined to represent a danger to themselves or others. As a general matter, the conditions of confinement in the Rehabilitation Unit are less restrictive than those prevailing in the Biggs Building. As patients are judged to no longer require confinement in a maximum security setting, they are usually transferred from the Biggs Building to the Rehabilitation Unit where they reside in progressively less restrictive wards until they are transferred to another institution or are discharged.

The patients confined in the Forensic Unit were committed under a variety of statutory provisions. The following describes the types of commitments and ap-

1. The class designation is based on the parties' stipulation, filed March 21, 1977. Patients temporarily confined in the Forensic Unit for the purpose of pretrial psychiatric observation and evaluation pursuant to § 552.020, RSMo, are specifically excluded from the class. Also excluded are patients who are in the Forensic Unit solely as a result of voluntary commitment pursuant to § 202.783, RSMo (repealed 1978) (see § 202.115, RSMo, effective Jan. 2, 1979) and not by court order.

2. Dr. Hensley no longer holds the office of Director. F.R.Civ.P. 25(d) provides for the automatic substitution of his successor in office; to date, however, no permanent successor has been appointed. Also named as defendants are Dr. Edward Tellez, Clinical Director of the Rehabilitation Unit at Fulton State Hospital, and Dr. Henry Bratkowski, Clinical Director of the Biggs Building at Fulton State Hospital. Drs. Tellez and Bratkowski, although still employed by Fulton State Hospital, no longer hold the title of Clinical Director.

proximate percentages of the patient population as of March 30, 1979:

| Type of commitment | Percentage |
| --- | --- |
| Involuntary civil commitment by Probate Court [3] | 15 |
| Not guilty by reason of mental disease or defect [4] | 50 |
| Pretrial psychiatric observation and evaluation [5] | 12 |
| Criminal sexual psychopath [6] | 10 |
| Transfers from the Missouri Department of Corrections [7] | 2 |
| Incompetent to proceed with trial [8] | 7 |
| Commitment by Juvenile Court [9] | 1 |
| Voluntary commitment [10] | 3 |

Plaintiffs contend that defendants are in violation of the eighth and fourteenth amendments to the United States Constitution by their failure to provide an adequate program of care and treatment for patients confined in the Forensic Unit. Plaintiffs also claim that certain of defendants' policies and practices regarding visitation, telephone, mail, and the use of seclusion and restraints, violate patients' constitutional rights.

This Court has jurisdiction under 28 U.S.C. § 1343(3).

## I.

## CONSTITUTIONAL RIGHT TO TREATMENT

In *Welsch v. Likins,* 550 F.2d 1122, 1125, 1126 n.6 (8th Cir. 1977), the Eighth Circuit recognized that noncriminal mentally ill or retarded patients committed to state institutions without their consent have a federal constitutional right to treatment. This recognition was premised upon the district court's holding that the due process clause of the fourteenth amendment requires that mentally retarded persons who have been civilly committed to state mental institutions be afforded at least minimally adequate treatment. *Welsch v. Likens,* 373 F.Supp. 487, 491–97 (D.Minn.1974). A constitutional right to treatment for mental patients has been recognized in several other circuits. *Bowring v. Godwin,* 551 F.2d 44, 48 n.3 (4th Cir. 1977) (dicta); *Scott v. Plante,* 532 F.2d 939, 947 (3d Cir. 1976) (states a claim); *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966) (dicta).

Defendants argue that the constitutional right to treatment of civilly committed mental patients is not well established in the law. *Rouse v. Cameron, supra,* the seminal case in the field, was decided on statutory grounds. "[W]e need not resolve the serious constitutional questions that Congress avoided by prescribing this right." *Id.* 125 U.S.App.D.C. at 370, 373 F.2d at 455. Adequate treatment was first held to be the *constitutional* right of civilly committed mental patients in *Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971), *aff'd sub nom. Wyatt v. Aderholt, supra. Wyatt* involved patients who were generally

involuntarily committed through noncriminal procedures and without the constitutional protections that are afforded defendants in criminal proceedings. When patients are so committed for treatment purposes they unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured

3. § 202.807, RSMo (repealed 1978) (see §§ 202.-121–.147, RSMo, effective Jan. 2, 1979). These patients are usually transfers from other facilities of the Missouri Department of Mental Health due to violent or aggressive behavior problems. Testimony of Joseph Mangini, Forensic Unit Director.

4. § 552.040, RSMo.

5. § 552.020, RSMo.

6. § 202.730, RSMo.

7. § 552.050, RSMo.

8. § 552.020, RSMo.

9. § 211.201, RSMo.

10. § 202.783, RSMo. (repealed 1978) (see § 202.115, RSMo., effective Jan. 2, 1979).

or to improve his or her mental condition. *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451; *Covington v. Harris,* 136 U.S.App.D.C. 35, 419 F.2d 617.

*Id.* at 784. Defendants point out that Judge Johnson's holding in *Wyatt* relies on cases from the District of Columbia Circuit interpreting statutory rights under the District of Columbia Code.

*Wyatt v. Stickney* was affirmed by the Fifth Circuit, *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974), on the basis of its earlier decision in *Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir. 1974). In *Donaldson v. O'Connor,* plaintiff was involuntarily committed to a state mental hospital for fourteen and one-half years. After his release, he sought to recover damages under 42 U.S.C. § 1983 from hospital and state mental health officials for their failure to provide him with psychiatric care in violation of his claimed constitutional right to treatment. The Fifth Circuit affirmed a judgment for plaintiff and held that the only constitutionally permissible justification for civil commitment of a nondangerous person to a state mental hospital is to provide treatment and that such persons have a constitutional due process right to such treatment.[11]

The Supreme Court vacated the judgment of the Fifth Circuit in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Defendants contend that the vacation of the Fifth Circuit's opinion in *Donaldson,* specifically depriving that opinion of precedential effect,[12] brings into question the validity of the entire theory of a constitutional due process right to treatment. The Eighth Circuit has not read *O'Connor v. Donaldson* in that way[13] and neither does this Court. The single issue decided by a unanimous Supreme Court in *O'Connor v. Donaldson* was that mental illness alone is not a sufficient justification to involuntarily confine a person who is not dangerous to others and can live safely in freedom. However, what may or may not be a constitutionally adequate justification for the involuntary confinement of the mentally ill or retarded is not at issue in this case. The Supreme Court concluded that the constitutional questions raised in this case were not present in *O'Connor v. Donaldson.* "Specifically, there is no reason now to decide whether mentally ill persons dangerous to themselves or others have a right to treatment upon compulsory confinement by the State . . . ." 422 U.S. at 572, 95 S.Ct. at 2492.[14]

11. The Fifth Circuit cited three grounds for civil commitment to mental institutions: danger to others, danger to self, and the need for treatment, care or supervision. Confinement by the state was justified as an exercise of the police power (danger to others or danger to self) or as an act by the state as *parens patriae* (danger to self or need for treatment). The first part of the court's two part right to treatment theory concerned the *parens patriae* rationale; if a person is confined by reason of need for treatment, due process requires that treatment in fact be provided. *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). The second part of the theory treats both the police power and *parens patriae* rationales. The court reasoned that where confinement by the state is not accompanied by fundamental procedural safeguards of the criminal justice system, there must be a *quid pro quo* provided by the government to justify involuntary confinement, the *quid pro quo* in the case of mental patients being treated. 493 F.2d at 520–22. It was the *quid pro quo* portion of the Fifth Circuit's theory that was specifically criticized by the Chief Justice in *O'Connor v.*

*Donaldson,* 422 U.S. 563, 578, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring).

12. 422 U.S. at 577 n.12, 95 S.Ct. 2486.

13. It should be said that the constitutional right of a non-criminal committed to a mental institution to be treated for his condition is probably clearer today than it was in February, 1974. While the Supreme Court has not yet held that such a right exists, *cf. O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), its existence was recognized in *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974), and in its companion case of *Burnham v. Department of Public Welfare,* 503 F.2d 1319 (5th Cir. 1974), *cert. denied,* 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975).
*Welsch v. Likens,* 550 F.2d 1122, 1126 n.6 (8th Cir. 1977).

14. There was a jury finding that Donaldson was neither dangerous to himself nor dangerous to others. 422 U.S. at 573, 95 S.Ct. 2486.

Defendants further argue that any constitutional right to treatment does not apply to the class of plaintiffs in this case. The great majority of the patients confined in the Forensic Unit came to be there by reason of their involvement in the criminal justice system. Prior to their commitment, these individuals were accused of serious crimes, including acts of violence. Many of those patients who were not accused of violent criminal acts prior to their commitment are transfers from other state mental health facilities, in which they could not safely reside due to violent or aggressive behavior. Defendants maintain that the dangerous character of the type of patient in the Forensic Unit provides a constitutionally acceptable basis for confinement *other* than for the provision of treatment. Therefore, say defendants, the State may confine such persons, in the exercise of its police power, for their own protection as well as for the protection of others, without being constitutionally required to provide treatment.[15] Defendants also point out that the *Wyatt* right to treatment cases did not involve a maximum security facility or patients committed because of their danger to themselves or others.

Federal courts have previously recognized a constitutional right to treatment in patients similar to those included in the plaintiff class. *Scott v. Plante,* 532 F.2d 939 (3d Cir. 1976) (incompetent to stand trial); *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966) (not guilty by reason of insanity); *United States v. Pardue,* 354 F.Supp. 1377 (D.Conn.1973) (incompetent to stand trial); *Davy v. Sullivan,* 354 F.Supp. 1320 (M.D.Ala.1973) (three judge court) (criminal sexual psychopath); *Stachulak v. Coughlin,* 364 F.Supp. 686 (N.D.Ill.1973) ("sexually dangerous person"). In *Davis v. Watkins,* 384 F.Supp. 1196 (N.D.Ohio 1974), and *Davis v. Balson,* 461 F.Supp. 842 (N.D. Ohio 1978), the court held that the patients

at Lima State Hospital, "a maximum security [hospital] for the criminally insane" operated by the Ohio Department of Mental Health and Mental Retardation, have a constitutional right to treatment. The holding in *Davis,* which was based on *Wyatt v. Stickney, supra,* concerned a patient population in many respects identical to that of the Forensic Unit. *Davis v. Balson,* 431 F.Supp. at 849–50.

█ This Court has no quarrel with defendants' contention that the state may confine the dangerous mental patient against his will in order to protect both society and the patient from his violent behavior. However, that well-settled justification for involuntary confinement does not dispose of the right to treatment issue. The mentally ill or retarded person who is committed to a state institution, be he dangerous to others, to himself, or not at all, is set apart from society. He is isolated from whatever opportunity he might have had to get treatment for his illness or mental disability had he remained at liberty. Confinement in a state mental hospital *absolutely forecloses* receipt of any treatment except that which the state chooses to provide. To confine the mental patient against his will no doubt entails a "massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). To withhold all opportunity for treatment may condemn him to a lifetime of hopeless mental illness, surely a greater deprivation. The Court therefore concludes that due process requires that the class of patients in this case, who have been involuntarily committed to a state mental hospital, be provided with such treatment as will give each of them a reasonable opportunity to be cured or to improve his mental condition. Of course, the fourteenth amendment does not require the state to do what is clearly unreasonable or impossible.[16]

---

**15.** Defendants cite the separate opinion of the Chief Justice in *O'Connor v. Donaldson:*

> There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society from the dangers of significant antisocial acts . . .

422 U.S. at 582–83, 95 S.Ct. at 2497 (separate opinion of Burger, C. J.).

**16.** This record demonstrates that there are patients suffering from mental illnesses for which present medical knowledge can provide little, if any, effective treatment. It follows that the

■ The fact that plaintiffs have been deemed dangerous does not deprive them of a constitutional right to treatment, as defendants contend. On the contrary, if a mental patient is involuntarily confined because he is dangerous, due process requires a specific focus to the treatment which is his right. Treatment efforts must be directed to that aspect of his behavior which caused him to be classified as dangerous so that he has a reasonable opportunity to be eventually discharged from maximum security confinement.[17] To hold otherwise would certainly "transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense." *Ragsdale v. Overholser*, 108 U.S.App.D.C. 308, 315, 281 F.2d 943, 950 (1950).

## II.

### THE CONSTITUTIONAL STANDARD

■ Defendants are correct that the Constitution does not impose a requirement of "optimal" or "good" treatment. "[T]he possibility of better treatment does not necessarily prove that the one provided is unsuitable or inadequate." *Rouse v. Cameron*, 125 U.S.App.D.C. at 366, 373 F.2d at 457. The patient committed against his will has a *constitutional* right only to that treatment as is minimally adequate to provide him a reasonable opportunity to be cured or to improve his mental condition. *Welsch v.*

*Likins, supra; Wyatt v. Stickney, supra.* Essential elements of minimally adequate treatment include a humane physical and psychological treatment environment, sufficient numbers of qualified staff, and an individualized treatment plan for each patient. *Watkins v. Davis, supra; Wyatt v. Stickney, supra.*

■ In determining whether the treatment provided patients in the Forensic Unit is constitutionally adequate, this Court is acutely aware that it is ill-equipped to deal with the complex problems of administering the maximum security unit of a state mental hospital. *See Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The courts must give deference in such matters to the solutions of the officials who are trained in the operation of such facilities and are charged with that responsibility, particularly when the problems are medical in nature. *Negron v. Preiser*, 382 F.Supp. 535 (S.D.N.Y.1974). It has been repeatedly confirmed that the role of the federal courts is not to sit as supervisor or administrator of state-run institutions. *E. g., Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). However, it is the duty of this Court to inquire whether the practices or conditions in a particular institution violate constitutional prohibitions or fail to provide what may be constitutionally required. *See Procunier v. Mar-*

---

involuntary commitment of a person not reasonably likely to benefit from treatment would not deprive him of realistic treatment opportunities available outside the state mental hospital. Therefore, the state's inability to provide a dangerous person with a reasonable opportunity to be cured or to improve his mental condition because no effective treatment is known would not render unconstitutional his involuntary confinement for the protection of himself or others.

It is not necessary to reach plaintiffs' eighth amendment claim.

**17.** *See Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972):

At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.

Defendants' policy is not to the contrary.
Any patient who is institutionalized against his wishes shall be entitled to adequate appropriate treatment. . . . For those committed to maximum security facilities, however, another element is added, namely, the right to treatment for that aspect of his or her behavior for which he was classified as dangerous and judged in need of maximum security. . . . [I]t is even more important to have a treatment program designed to treat the dangerousness in individuals in order that they can safely progress to less restrictive facilities for continuation of their treatment for psychiatric symptoms as soon as possible.
Missouri Department of Mental Health, Standards, Psychiatric Hospitals and Clinics 114 (Nov. 1, 1975).

*tinez, supra. See also Bell v. Wolfish,* —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). With these matters firmly in mind, the Court now considers the specific issues raised by plaintiffs.

## III.

### PHYSICAL ENVIRONMENT [18]

The Biggs Building contains ten permanent wards for patient residence.[19] Space within the building is used for various other purposes, including the visiting room, library, patient canteen, medical and dental clinics and examination rooms, main clothing room, staff conference room, barber shop, offices outside the security gate for administrative and medical staff, and offices inside the security gate for social workers, psychologists and other therapists. There are also areas for the vocational education program, the academic education program, music therapy and occupational therapy programs. There is a dining hall with kitchen facilities and an attached recreational building containing an indoor swimming pool,[20] a game room with two bowling alleys, and a gymnasium equipped with movie projector and screen. Each patient ward generally includes a dayroom, nurses' station, clothing room (in which all of the patients' clothing is stored), lavatory containing toilets and sinks, bathroom with showers and/or tubs, and individual sleeping rooms. Seven of the ten permanent wards contain dormitories in addition to the individual sleeping rooms.

There was much testimony, from both plaintiffs' and defendants' experts, concerning the relation between physical setting and effective treatment of mental illness or retardation. Experts from both sides testified that the immediate physical environment can have a definite effect on patients' psychological conditions.[21] There was testimony that drab and depressing surroundings can be harmful or counter-therapeutic as patients may become withdrawn as a reaction to their environment. There was testimony that the patient living areas should be as homelike as possible, as "normalized" as possible; that normalization of the environment enhances treatment. There was evidence of the importance of visual stimulation, by making the wards as bright, cheerful, and as pleasant as possible, in order to avoid the effects of long-term institutionalization and to enhance patient interest in education and personal development. In addition, experts from both sides testified to the importance of personal privacy. Privacy enhances and may be necessary to the self-respect of each patient; the lack of privacy can be dehumanizing and counter-therapeutic.

■ In the opinion of this Court, many of the factors, especially the psychological factors, contributing to a "humane" environment for the treatment of mental illness or retardation are uniquely within the expertise of those charged with the operation of the Forensic Unit. The important consideration of providing adequate security for the patients and staff is an additional factor that, in many situations, may override the therapeutic interest in a humane treatment environment. With the advice of experts in the field, this Court could devise its own plan which might improve the environment in the Biggs Building and enhance the treatment function by providing more comfortable surroundings. However such an exercise might benefit the patients' living conditions, that is not the Court's constitutional role. Only those conditions which violate a constitutional prohibition or operate to deny a constitutional right are subject to the examination of a federal court.

---

18. This discussion concerns only conditions in the Biggs Building. The parties have stipulated that the physical facilities of the Rehabilitation Unit are adequate.

19. An additional ward is used for temporary patient residence when one of the permanent wards is being renovated.

20. There was testimony from a number of witnesses that the swimming pool was not functional at various times during the pendency of this suit.

21. Testimony of Drs. Frank Rundle and Harris Rubin for plaintiffs, Dr. Robert Schaffer for defendants.

Although plaintiffs' experts, as well as defendants' experts, had specific criticisms of the Biggs Building, none was willing to describe the facility generally as "inhumane." This Court has identified certain physical aspects of the Biggs Building that are not minimally adequate to provide the humane treatment environment required by the Constitution and will examine each in turn.

### A.

### Climate Control

■ There was overwhelming evidence that a combination of extreme temperature and high humidity in the Biggs Building causes the patient living areas to be almost unlivable during the late spring and summer months.[22] Descriptions of the climate inside the Biggs Building ranged from "extremely warm" and "exceedingly uncomfortable" to "incredibly hot" and "unbearable." A former staff member testified that the heat and humidity caused the patients to become lethargic.[23] There was also evidence that certain parts of the building are very cold in winter, due in part to drafts from sprung windows that are difficult to close.[24] The Court finds that the climatic conditions in the Biggs Building are not minimally adequate to provide a humane treatment environment.[25]

### B.

### Lavatories and Bathrooms

■ Each lavatory on the patient wards contains from three to five toilet fixtures and generally a corresponding number of sinks. The toilets are without seats and are separated by partitions approximately forty inches high. The partial stall thus created does not completely enclose the toilet, and there is no door to screen the toilet while in use. The bathrooms generally contain three to four showers and/or bathtub. There are no curtains or partitions to provide privacy while bathing. The expert testimony offered by both parties was unanimous in condemning the inadequate privacy afforded by the lavatories and bathrooms in the patient wards. The Court finds that the lavatories and bathrooms on the patient wards, at least with respect to patient privacy, are not minimally adequate.[26]

### C.

### Dormitories

■ Seven of the ten permanent wards have sleeping dormitories in addition to individual sleeping rooms. The dormitories are divided into "cubicles" usually containing two beds. The beds are located in close

22. Defendants' experts also assigned the installation of air conditioning a high priority. Testimony of Drs. Hubert Carbone, Robert Schaffer and Albert Glass.

23. Testimony of Bonnie McBride.

24. Testimony of Joseph Mangini, Forensic Unit Director. There was additional testimony that parts of the heating system, now repaired, were broken down for one month during the winter of 1977–78, leaving sections of the building without heat.

25. Funds have already been appropriated by the Missouri legislature to air condition at least two, and possibly four, wards in the Biggs Building, to be functional by the summer of 1980. No inference should be drawn from the above finding that air conditioning is a constitutional prerequisite for an adequate physical facility. The Court's finding is based upon the unique circumstances of the construction and location of the Biggs Building. Funds also

have been appropriated by the legislature to replace all of the windows in the Biggs Building.

26. Mr. Mangini, the Unit Director, testified that the open toilets and bathing facilities were so designed as a security precaution to allow continual observation of patients by ward staff. Design reflecting security considerations is valid and extremely important. Security will be a key factor at the final remedy stage of this case. The record at this point is not sufficiently developed for the Court to make a final conclusion whether, in the case of lavatories and bathrooms, security needs outweigh the privacy factor. Although Mr. Mangini testified that the lack of privacy was caused by security considerations, he also testified that the capital improvement funds already appropriated by the legislature include money to remodel sixteen lavatories and bathrooms *to achieve improved privacy for patients.*

proximity to one another. There was testimony by plaintiffs' experts that the sleeping dormitories do not provide adequate privacy for patients.[27] Further, the dormitories were characterized as "dangerous." Plaintiffs' expert pointed up the possibility of sexual misconduct accompanied by coercion or force, as forceful individuals often are able to control weaker patients.[28] Physical assault, whether sexual or otherwise, might not be readily detectable by staff members because the sleeping dormitories are not covered by the closed circuit television monitoring system. The Court finds that the sleeping dormitories in the Biggs Building, as they are presently constructed, are not minimally adequate with respect to patient privacy and with respect to patient security from assault.[29]

### D.

*Furnishings and Personal Belongings*

The individual sleeping rooms on eight of the ten permanent wards in the Biggs Building are furnished with only a bed. All clothing is kept in the ward clothing room, where each patient is assigned an open bin for folded clothing and a hanger for his shirt, jacket or coat. Other personal belongings are stored in a small locker in the ward dayroom. The individual sleeping rooms are painted in a variety of colors but are devoid of personal effects, books, pictures, decorations, or any indication of individuality. Except for a bed, each room is completely bare, and, in the words of one of defendants' expert witnesses, appears "very stark."[30]

In marked contrast are the individual sleeping rooms on the remaining two wards.[31] These rooms are similar to those described above in size and design, but are worlds apart in suitability for human living. Each room is furnished with a bed, table or desk, chair, and perhaps bookshelves. Individual decoration is the most striking distinction. Patients display photographs, posters, pictures, and small rugs. The desk or table is used to store books and writing materials and to store and display other personal possessions. These rooms exhibit diverse personalities and appear relatively habitable; they are not bare, drab, or stark.

Plaintiffs' experts testified that the "amenities of civilized living" are necessary to a humane treatment environment. This requires, say the experts, furnishing individual sleeping rooms with at least a bed, a table or desk, and a chair.[32] The testimony of defendants' experts who spoke to the subject is in accord as to the importance of the mental patient's immediate environment and the provision of furniture.[33]

At first glance, the matter of furniture appears to be one area in which the Court has no place substituting its judgment for that of defendants. *See Bell v. Wolfish,* —— U.S. at ——, 99 S.Ct. 1861, 60 L.Ed.2d 447. However, the testimony and photographic exhibits presented at trial

**27.** The former Director of the Missouri Department of Mental Health agreed with this assessment of the Biggs Building dormitories. Deposition of Dr. Duane Hensley.

**28.** Testimony of Dr. Harris Rubin.

**29.** It should be noted that the above finding does not amount to a *per se* proscription of sleeping dormitories to house involuntarily committed mental patients. The Court's finding is based on the facts of this case, which involves patients who have been committed to the Forensic Unit because of the danger of their violent and aggressive behavior.

Mr. Mangini testified that funds already appropriated by the Missouri legislature include money to convert the sleeping dormitories in the Biggs Building to individual sleeping rooms.

**30.** Testimony of Dr. Hubert Carbone.

**31.** These wards house patients in the criminal sexual psychopath and personality disorder categories, as well as patients of all diagnoses who have been approved for transfer to the Rehabilitation Unit because they are no longer in need of confinement in a maximum security setting. A reasonable inference is that such patients present a comparatively lower risk of unpredictable outbursts of violent behavior.

**32.** Testimony of Drs. Frank Rundle and Frank Gilner.

**33.** Testimony of Drs. Hubert Carbone and Robert Schaffer.

firmly convince this Court that, in a treatment context, the issue rises to a constitutional level. Substance is added to the definition of "humane environment" by testimony on the importance to effective treatment of "normal" surroundings, of visual stimulation, and of privacy, which certainly includes the opportunity to keep and use one's own personal belongings.[34] The bare rooms and restrictive storage arrangements on the eight described wards do not provide a humane treatment environment.[35] The Court finds that the individual sleeping rooms on Wards 1, 2, 3, 5, 6, 7, 8 and 9 are not minimally adequate in the respects discussed above.

The furnishing of patient rooms and allowing possession of personal belongings or clothing is an area with serious implications regarding security. The most innocuous furnishing might become a dangerous weapon in the hands of a disturbed patient acting out in an aggressive or suicidal manner. The record in this case is not sufficiently developed to permit a comprehensive solution to the problem.[36] However, an individualized approach has been suggested in which treatment staff could withhold individual furnishings from a patient deemed to be a present security risk. For the protection of the patient, a written order with medical reasons stated thereon might be required, which order could be renewed periodically upon subsequent assessment of the patient's condition.

## IV.

### STAFF

Plaintiffs contend that there are inadequate numbers of qualified staff in the Forensic Unit to provide minimally adequate treatment. This argument has been directed generally at an alleged inadequacy in numbers of staff, rather than at their qualifications or competency as a group. Experts from both sides of the case testified that the Forensic Unit staff is generally well qualified, competent, hard-working, and dedicated. At trial, plaintiffs offered extensive expert testimony regarding the numbers of staff necessary to carry on the Forensic Unit treatment programs.[37] Plaintiffs' experts provided the Court with comprehensive recommendations regarding the overall staffing of the Forensic Unit[38]

---

**34.** *See* Missouri Department of Mental Health Operating Regulation No. 148 (Jan. 20, 1975):

Each patient or resident in a Missouri Department of Mental Health facility has the following rights:

. . . . .

11. To keep and display personal belongings unless your physician says no and writes the medical reason in your record; . . .

**35.** *See Davis v. Watkins,* 384 F.Supp. 1196, 1210 (N.D.Ohio 1974) (Court ordered that patients similar to the population of the Forensic Unit be furnished a bed, a closet or locker, and appropriate furniture such as a chair, bedside table, mirror, rugs, and bookshelves, unless contraindicated by professional staff who shall state the reason in writing); *Wyatt v. Stickney,* 344 F.Supp. 373, 381 (M.D.Ala.1972) (bed, closet or locker for personal belongings, chair, and bedside table), *aff'd sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974). *Cf. Burks v. Walsh,* 461 F.Supp. 454, 460 (W.D.Mo.1978) (general population cells at the Missouri State Penitentiary are furnished with a bed, table, chair, and locker).

**36.** Dr. Robert Schaffer, as expert for defendants, testified that furnishings such as curtains, tables, chairs or lamps could be a *potential* security problem.

**37.** Patients are assigned to one of six treatment programs depending on diagnosis: Program 1, chronic schizophrenics; Program 2, criminal sexual psychopaths, personality disorder, and pretransfer patients; Program 3, mentally retarded and brain damaged patients; Program 4, maximum security patients, new admissions, and acute schizophrenics; Program 5, patients being evaluated prior to trial; Program 6, Rehabilitation Unit. A team of treatment staff is assigned to each program.

**38.** Dr. Frank Rundle testified that an optimal staffing level for a facility such as the Forensic Unit would yield a treatment staff/patient ratio of 0.486:1 and a total staff/patient ratio of 2.1:1. Dr. Rundle stated that absolute minimal staffing ratios would be 0.475:1 for treatment staff and 1.75–1.95:1 for total staff. Dr. Rundle's specific staffing recommendations, however, yield staff/patient ratios somewhat lower than that: Biggs Building: treatment staff/patients, 0.35:1, total staff/patients, 1.2:1; Rehabilitation Unit: treatment staff/patients, 0.3.-1:1, total staff/patients, 1.0:1.

Dr. Terry Brelje testified that the type of patient confined in the Forensic Unit required a

and with staffing recommendations for each specific treatment program. Several members of the Forensic Unit treatment staff also testified, each giving his or her view of the current staff situation and the needs of each treatment program for additional staff. Unit and Hospital administrators testified of the general sufficiency of the present staff, each adding, however, that more staff would be of great use in every program.[39] Testimony of defendants' experts characterized Unit staffing levels as generally sufficient to provide minimally adequate treatment, with a caveat as to perceive deficiencies in one or another specific area.[40]

This record has been examined with great care. The Court is impressed that the staff of the Forensic Unit performs a difficult task, often with much less than optimal resources. It is an unfortunate fact that the treatment programs established in the Forensic Unit, through no fault of the limited personnel, often do not equal the high professional standards of either the expert witnesses or of the Forensic Unit staff itself. Provision of additional resources to insure a greater opportunity for effective treatment of the mentally ill and retarded

patients confined in the Forensic Unit is highly desirable and would be the act of an enlightened legislature. That constitutional role does not fall to this Court.

In *Wyatt v. Stickney,* 344 F.Supp. at 375, the staff of an Alabama general psychiatric hospital was held to be constitutionally inadequate. The court found that "most staff members were poorly trained and that staffing ratios were so inadequate as to render the administration of effective treatment impossible." The record is clear that that description does not apply to the staff of the Forensic Unit. It is also clear that the staff/patient ratios of the Forensic Unit fall below, some may say significantly below, the recommendations of plaintiffs' experts.[41] Such standards and recommendations are instructive and useful in determining constitutional minima, but they are not dispositive. Although this Court is convinced that there is much room for needed improvement in the staffing levels of the Forensic Unit, it is unable to find that the present level of staffing works a *constitutional* deprivation. Accordingly, the Court finds that the staff of the Forensic Unit is minimally adequate.[42]

total staff/patient ratio of 1.5:1, but that the minimally adequate staffing level would probably yield a total staff/patient ratio of below 1.5:1.

39. Dr. Hugh Shallenberger, Assistant Superintendent for Treatment of Fulton State Hospital, testified that the staffing level in the Forensic Unit is "marginal," enough to do the job but not plentiful. Dr. James Ritterbusch, Superintendent, included 39 additional personnel in the budget request for Fulton State Hospital for fiscal year 1979–1980. He testified that the additional personnel were not absolutely necessary to implement treatment plans but would relieve a "hardship" in staffing levels. Dr. Ritterbusch testified that, in his opinion, the Forensic Unit was short 2 psychiatrists, 5–6 social workers, 3–4 psychologists, and 5–6 clerical staff.

40. Dr. Jonas Rappeport testified that staffing levels were minimally adequate, but that an additional psychiatrist was needed to supervise treatment in the Rehabilitation Unit. Dr. Hubert Carbone testified that the numbers of the staff were minimally adequate, but that there was a need for more treatment staff to be

assigned to Program 4, as well as a need for more registered nurses.

41. In the Biggs Building, the ratio of treatment staff to patients is 0.187:1 and the total staff/patient ratio is 1.00:1. The Rehabilitation Unit treatment staff/patient ratio is 0.228:1 and the total staff/patient ratio is 0.777:1. Combined ratios for the entire Forensic Unit are treatment staff/patients, 0.198:1; total staff/ patients, 0.998:1. In calculating these ratios, patients in the Forensic Unit for pretrial psychiatric evaluation and staff directly attributable to such patients were excluded.

42. Plaintiffs object to the administration of medication by trained psychiatric aides, *i. e.,* by anyone not qualified as at least a licensed practical nurse. Psychiatric aides who administer medication in the Forensic Unit must pass a medication course which exceeds the minimum standard of the State Board of Education of the Missouri Division of Mental Health and are subject to review every two years. There was evidence of a January 6, 1978, report revealing medication discrepancies and errors by psychiatric aides in the Forensic Unit. Testimony of Belinda Heimericks. One cause of such errors

## V.

### INDIVIDUAL TREATMENT PLANS

The third essential element of minimally adequate treatment is an individualized treatment plan for each patient. Such a plan is not only a treatment tool necessary for the coordination of treatment efforts by many staff members, but also functions as a device to insure that each patient is treated as an individual and is not overlooked or forgotten among the many patients in a large state mental hospital.

■ The Missouri Department of Mental Health adopted a policy requiring the use of individualized treatment plans in 1975.[43] Dr. Hugh Shallenberger, Assistant Superintendent of Fulton State Hospital, testified that no specific training in preparing the new type of plan was provided in 1975, and that as a result the early plans were poorly written and probably not useful treatment tools. Under a grant from the National Institute of Mental Health, the hospital administration brought in a consultant to train core staff members in preparing and using the plans, who would in turn train the remainder of the staff. Training was begun in March, 1978, and continues presently. Dr. Shallenberger testified that complete training may take three years and that the consultant will be returning in the future to reassess the treatment plan program. Plaintiffs' experts reviewed the treatment plans of patients in the Forensic Unit in 1976, 1978, and immediately prior to trial. Their testimony was that the plans were substantially inadequate in 1976. The record indicates, however, that by 1979 the overall quality of the plans showed a marked improvement, even though the plans were, in the opinions of plaintiffs' experts, still inadequate. Specific criticism of the present treatment plans was directed at the delay between admission and preparation of the initial treatment plan and at the length of time before each plan is reviewed. There was also testimony that some plans are incomplete and written in too general terms to be of real value. A former Forensic Unit staff member testified that the initial treatment plan was usually prepared after the patient had a "staffing" by treatment team members ninety days after admission, although hospital policy required preparation of the initial plan earlier than that. She also testified that review of the plans took place when staff members could find the time to do it, not on any regular basis, but generally more frequently than once every two months.[44] There was testimony from staff members that, as of the date of trial, treatment plans had not been prepared for significant numbers of patients.[45] Recent admissions accounted for only part of those patients without treatment plans.

Although it is apparent that room exists for improvement in the quality of the individualized treatment plans, the Court finds that the plans in existence are minimally

was identified as insufficient nurses to properly supervise medication aides. Ms. Heimericks also testified that the number of nurses on the staff had increased since her report and that she thought the situation had improved, but did not specifically know that it had.

The use of trained psychiatric aides to administer medication is common in state hospitals due to a shortage of professional nursing staff. Testimony of Dr. Jonas Rappeport. If more resources in the form of professional nursing personnel were made available to state mental hospitals, it is likely that the quality of nursing care, including the administration of medication, would improve greatly. However, the Court is unable to find that defendants' policy or practice of using trained psychiatric aides to administer medication involves a *constitutional* deprivation.

**43.** Missouri Department of Mental Health Operating Regulation No. 149 (Jan. 20, 1975) requires that a written individualized treatment plan be prepared for each patient not later than 5 days after admission. The plan is to contain the reason for hospitalization, patient problems, treatment, measure for treatment effectiveness, time for measurement, staff responsibilities, length of time before review is to be done, least restrictive environment, therapeutic work assignment, if any, and wages to be paid.

**44.** Testimony of Bonnie McBride.

**45.** Testimony of Bonnie McBride and David Jannick.

adequate.[46] However, the Court further finds that the long delay in preparation of the initial treatment plan after admission and the lack, in practice, of regular review of the plans based on a reasonable review period operate to deny each patient a minimally adequate treatment plan.

## VI.

### LEAST RESTRICTIVE ENVIRONMENT

■ When a patient's treatment team finds that his condition no longer requires confinement for treatment in a maximum security setting, the team makes a recommendation that the patient be transferred from the Biggs Building to the less restrictive environment of the Rehabilitation Unit. Upon that recommendation, the patient is moved to the Biggs Building pretransfer ward, Ward B–11. Before he is actually transferred to the Rehabilitation Unit from Ward B–11, the patient must have a staffing attended by the hospital Superintendent, Dr. Ritterbusch, who must give his approval to the transfer.[47] The evidence shows that after a patient is placed on the pretransfer ward, he must wait from two to four weeks to as long as two months for the required staffing. There is a further wait for a vacancy in the Rehabilitation Unit ever after Dr. Ritterbusch approves the transfer, from as little as two weeks to as long as four to six months. In practice, this procedure can result in a patient waiting in the Biggs Building pretransfer ward for up to eight months (although a wait that long would be somewhat rare) *after* his clinical treatment team found that his condition no longer required that he be confined for treatment in a maximum security unit. Defendants admit that this result is caused by a lack of sufficient less restrictive facilities, either in the Forensic Unit or elsewhere.[48]

Such confinement is not consistent with due process. Patients are placed in the maximum security section of the Forensic Unit (the Biggs Building) because of their dangerousness. After the treatment staff has determined that that aspect of a patient's behavior is no longer present, there is no constitutional justification for the continued "massive curtailment of liberty" inherent in confinement in the Biggs Building. In *Covington v. Harris*, 136 U.S.App. D.C. 35, 41, 419 F.2d 617, 623 (1969), the District of Columbia Circuit held that a requirement of the least restrictive alternative was implicit in a District of Columbia commitment statute and stated:

> The new legislation apart, however, the principle of the least restrictive alternative consistent with the legitimate purposes of commitment inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty
>
> . . . .

See *Eubanks v. Clarke*, 434 F.Supp. 1022 (E.D.Pa.1977); *Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D.Iowa 1976); *Davis v. Watkins, supra; Welsch v. Likins, supra.*

Plaintiffs suggest that the appropriate remedy for this constitutional violation is an order requiring the immediate transfer of those patients who have been approved for transfer from the Biggs Building to the Rehabilitation Unit. Although urgency of remedy is a very important consideration in this matter, the Court is not able to adopt plaintiffs' suggested remedy. Dr. Ritterbusch testified that the Rehabilitation Unit is operating at its patient capacity, even though there are some vacant beds. There is a real danger that the immediate transfer of all patients on the transfer waiting list would cause overcrowding in the Rehabilitation Unit, disrupt on-going treatment, and create a serious security problem. This Court will not impose a remedy that may result in substantial harm to those seeking

---

**46.** Patients for whom no plan has been prepared are, of course, being denied a minimally adequate individualized treatment plan.

**47.** There was evidence that patients with no history of violent behavior can be transferred

to the Rehabilitation Unit without being staffed by Dr. Ritterbusch.

**48.** Testimony of Joseph Mangini, Forensic Unit Director.

relief. However, the problem of the transfer waiting list requires priority attention from defendants and an expedited solution.

## VII.

### VISITATION, TELEPHONE AND MAIL

Visiting hours in the Biggs Building are from 1:00 p. m. to 2:40 p. m. every afternoon. On weekends and holidays a morning visiting period from 9:00 a. m. to 10:45 a. m. is also permitted. Visits may last the entire visiting period unless the visiting room is crowded, in which case visits may be restricted to thirty minutes.[49] No person under the age of fifteen is permitted in the Biggs Building visiting room. Patients may be visited by their children under fifteen by special arrangement. These visits take place in a separate room and are limited to fifteen or twenty minutes. In the visiting room, patients visit across a table; no personal contact such as touching or holding hands is permitted.

The visiting policy in the Rehabilitation Unit is more liberal, with visiting hours of 9:00 a. m. to 11:00 a. m., 1:00 to 4:00 p. m., and 7:00 to 8:00 p. m. daily. No ex-patients or employees may visit patients without the prior approval of the treatment staff. Children under fourteen may not visit on the wards of the Rehabilitation Unit; families with children must visit in the canteen.[50]

Patients in the Biggs Building may receive incoming telephone calls from their attorneys only if such a call is arranged and approved in advance. Patients may receive *no other incoming calls.*[51] A patient may place an outgoing call only if request is made and approval received from the treatment staff. Approval is given only in case of an "emergency" (*e. g.*, death or serious illness in the patient's family) or "when it is determined to be beneficial to the patient."[52] Patients may place collect calls to their attorneys only prior to a ninety day staffing, before a court appearance, or prior to "other legal technicalities regarding their case."[53]

Rehabilitation Unit patients have access to pay telephones in the main Administration Building which may be used during patients' pass time.[54] At other times, they may call their lawyers at any time and may place collect calls to their families once a week. Rehabilitation Unit patients appar-

---

**49.** The visiting regulations permit a patient to be visited at one time by any number of visitors; however, the visiting room has a capacity for only 15 visitors (30 seats). The visiting room measures 49'6" by 14'9" (730 square feet). Mr. Mangini testified that patients are aware of an exception in the visiting rules for visits by young children in rooms other than the Biggs visiting room. This testimony is corroborated by information provided patients in Biggs Unit Handbook for Residents at 45: "a special visit may be arranged through your social worker or doctor." However, the visiting policy does not mention the exception: "No persons under fifteen (15) years of age will be permitted to visit in the Biggs visiting room." The record is unclear whether patient's families are sufficiently informed of the exception to make it a real alternative. The Court's comments on the short duration of regular visiting hours apply with greater weight to the 15–20 minutes time a patient is permitted to visit with his young children.

**50.** Plaintiffs contend that this policy operates as an effective bar to visits by the young children of patients on Wards 2-South and 3-South (the locked wards) because these patients "are normally not allowed off the ward." Plaintiffs'

Post-Trial Brief at 7 n.16. The record does not reveal whether patients on those wards are allowed to leave the ward for a visit with their young children. If patients were not allowed visits with their children, such a policy would be subject to a more severe criticism than the Biggs Building policy toward visits by young children.

**51.** Missouri Department of Mental Health Operating Regulation No. 148 (Jan. 20, 1975) states that patients have a right "to be given writing materials and *reasonable use of a telephone* if [they] have no money." (emphasis added).

**52.** Unit Policy for Use of Telephone by Biggs Patients.

**53.** *Id.*

**54.** Plaintiffs claim that patients in Rehabilitation Unit Wards 2-South and 3-South are not allowed such access to pay telephones, as they "are normally not allowed off the ward." Plaintiffs' Post-Trial Brief at 8 n.18. There is simply no evidence in the record to prove or disprove that contention.

ently may receive incoming calls, provided callers identify themselves, except that no calls may be received from ex-patients or employees without approval from the treatment staff.

All outgoing mail from patients in both the Biggs Building and the Rehabilitation Unit may be sealed by the patients and is not screened by Forensic Unit staff in any way.[55] Postage for two free letters per week is provided to each patient. Incoming mail to patients in the Biggs Building and the two locked wards of the Rehabilitation Unit is opened and checked for contraband before it is delivered to the patients. Correspondence is not read by hospital staff. The screening for contraband is done in an administration office, outside the presence of the patient-addressee, except for attorney or court-related mail which is opened and screened for contraband in the presence of the addressee.

Plaintiffs challenge certain aspects of the visitation, telephone, and mail policies on the ground that they are unduly restrictive, in many instances counter-therapeutic, and violative of the patients' constitutional rights. As discussed above, this type of institutional regulation is particularly within the province of the Forensic Unit administration, and it is not the constitutional role of the Court to substitute its judgment for that of the state officials responsible for the Forensic Unit, absent a *constitutional* violation. Defendants argue that none exist.[56]

▉ Plaintiffs were committed to the Forensic Unit to receive treatment in a maximum security setting. Like the pretrial detainees in *Bell v. Wolfish*, —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), plaintiffs may be legitimately confined and subjected to conditions and restrictions inherent in such confinement, as long as those restrictions do not amount to punishment or are otherwise violative of the Constitution. The restrictions challenged by plaintiffs must be analyzed in terms of the legitimate policies and goals of the Forensic Unit. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). If restrictions imposed by confinement in the Forensic Unit are not reasonably related to a legitimate government objective, or if such restrictions are excessive in relation to that objective, the resulting deprivation of liberty amounts to punishment and a denial of due process. *Bell v. Wolfish, supra.*

Defendants justify the restrictions of the Biggs Building visiting policy as necessary security procedures. Although no such justification is urged for the Biggs Building telephone policy, the record reveals that security concerns also may be inherent in telephone use or abuse by patients.[57] Defendants' legitimate interest in the efficient administration of the Forensic Unit also would justify limits and restrictions placed on visiting hours and telephone use to insure that facilities are used in an orderly manner and that neither visitation nor telephone use by patients interferes with the normal operations of the Forensic Unit.

**55.** Prior to September, 1977, all incoming mail was opened and checked for contraband outside the presence of the patient-addressee. All outgoing mail, except that addressed to "any official, lawyers, etc.," was read by hospital staff and subject to censorship. Plaintiffs suggest that the Court rule on defendants' *pre-existing* mail policy and rely on language in *United States v. W. T. Grant Company*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), to the effect that the voluntary cessation of illegal conduct does not render an issue moot. The Court declines to so rule. In *W. T. Grant* the Supreme Court also stated that there must exist "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." There is

nothing in this record to indicate *any* likelihood that defendants will revert to the old mail policy and this Court is satisfied that no relief is needed with respect to the old policy. *Id.* at 633, 73 S.Ct. at 898.

**56.** Defendants' position is that plaintiffs' claims regarding the mail and telephone policies simply do not present constitutional questions. Defendants cite *White v. Keller*, 438 F.Supp. 110 (D.Md.1977), *aff'd*, 588 F.2d 913 (4th Cir. 1978), and other cases concerning prison and jail visitation policies and state that there is no federal constitutional right to prison visitation, either for prisoners or visitors.

**57.** Testimony of Dr. Terry Brelje.

However, the restrictions imposed on patients by the Biggs Building visitation and telephone policies are so extreme as to be not reasonably related to legitimate interests in either security or orderly hospital administration. The patient confined in the Biggs Building is effectively precluded from using the telephone; he may not receive calls from relatives, friends, his wife, or children. In the absence of an "emergency," he may not make calls out of the building. The combination of short visiting hours (one hour and forty minutes) and the completely inadequate capacity of the visiting room (where visits are restricted to one-half hour if the room is crowded) discourage long and comfortable visitation. These severe restrictions isolate patients from the outside world and constitute an excessive and arbitrary response to a legitimate interest in institutional security. Additionally, these policies are completely at odds with the therapeutic objective of the Forensic Unit. Visitation and telephone contacts are important to maintain ties in the community outside the mental hospital. To impose so complete a limitation on outside contact deprives patients of needed support from family, friends and other resources in the community. The result of isolation from the outside world can be counter-therapeutic and actually harmful.[58] The Court finds that the visitation and telephone policies of the Biggs Building are so restrictive as to constitute punishment and are therefore violative of patients' rights under the due process clause of the fourteenth amendment. The Court further

finds the restrictions imposed by the visitation and telephone policies of the Rehabilitation Unit to be not so severe, and that such policies fall within defendants' broad discretion to define institutional regulations.

 The Court must disagree with plaintiffs' argument that they have an unrestricted right to receive sealed legal mail. Defendants' policy of opening legal mail in the presence of the addressee to inspect for contraband (without reading the correspondence) is reasonably related to the substantial government interest in maintaining the security of the Forensic Unit to protect both patients and staff. *Wolff v. McDonnell*, 418 U.S. 539, 577, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court also must disagree with plaintiffs' contention that incoming nonlegal mail may be opened to inspect for contraband *only* in the presence of the addressee. Defendants' decision to screen nonlegal mail for contraband (correspondence is not read) at a central location, before the mail is brought onto the wards, is within the realm of administrative judgments to which the Court must defer.[59]

## VIII.

## SECLUSION AND RESTRAINT

### A.

### *Medication*

Plaintiffs' contention that there is excessive use of medication to control patient

---

**58.** Testimony of Drs. Frank Gilner, Harris Rubin, and Terry Brelje. The Court must note that, although it is a maximum security facility housing patients dangerous to themselves or to others, the Forensic Unit is a mental hospital and not a prison. Even though the valid government interest in institutional security may at times override all others, the pre-eminent objective of the Forensic Unit is treatment and rehabilitation. There may be patients whose conditions would justify greater or more particular limitations on visitation or telephone use consistent with defendants' important interest in institutional security. An order of limitation written in such patients' treatment plans would constitute an individualized approach. Regarding visitation and telephone rights at mental hospitals, see *Gary W. v. Loui-*

*siana*, 437 F.Supp. 1209, 1228 (E.D.La.1976); *Davis v. Watkins*, 384 F.Supp. 1196, 1207–08 (N.D.Ohio 1974) (forensic patients); *Wyatt v. Stickney*, 344 F.Supp. 373, 379 (M.D.Ala.1972), aff'd sub nom. *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

**59.** *Contra, Davis v. Balson*, 461 F.Supp. 842 (N.D.Ohio 1978) (the presence of the patient is the only way he can know his mail is not read). *See Wyatt v. Stickney*, 344 F.Supp. 373 (M.D. Ala.1972) (patients have a right to receive sealed general mail unless the treatment staff imposes a special restriction by written order), aff'd sub nom. *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

behavior, a form of "chemical restraint," is not supported by the record. Expert witnesses from both sides testified that observation of patients and examination of records indicated that Forensic Unit patients are not overmedicated.[60]

### B.

### *Seclusion and Physical Restraint*

Seclusion is a means of restricting a patient by removing him from social contact and placing him in a locked room. Seclusion in the Forensic Unit involves placing the patient in one of the individual sleeping rooms on the ward, usually furnished with only a bed, and locking the door. During seclusion, the patient is not permitted to wear his clothing, excepting underwear. Restraint is a means of restricting a patient's ability to react physically by temporarily limiting his freedom of body and limb movement by use of physical or mechanical restraints, such as cuffs, straps, mittens or braces.

■ There was a consensus of expert testimony that the occasional use of seclusion and physical restraints is a necessary and useful treatment device in mental hospitals, especially with the type of dangerous patient housed in the Forensic Unit. However, a *medical* decision to physically restrain or isolate a mental patient involves no less an extraordinary deprivation of liberty than does the use of punitive isolation in a prison. *Negron v. Preiser*, 382 F.Supp. 535 (S.D.N.Y.1974). "A protected interest is no less infringed by government action taken for reasons which purport to serve [a] . . . rehabilitative purpose than by

government action taken for disciplinary reasons." *Davis v. Balson*, 461 F.Supp. 842, 876 (N.D.Ohio 1978). In prison, an inmate's fourteenth amendment rights regarding the imposition of punishment, including isolation, are protected by the due process hearing requirements in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The mental patient has no less *right* to due process regarding the imposition of the very conditions (seclusion or isolation) which would require a due process hearing in a prison context.

■ As stated above, the range of discretion of state officials is greatest in decisions involving medical judgments. *Negron v. Preiser, supra.* Moreover, the procedures required to insure due process vary with the nature of the governmental function involved, as well as the private interest affected. *Wolff v. McDonnell, supra.* A requirement of advance notice and hearing is not at all appropriate to the medical decision to use seclusion or restraints. Such a decision often is made under conditions of emergency, in which an agitated patient presents an immediate danger to himself or others. However, this Court concludes that minimal due process requires at least that the *medical* decision to utilize physical restraints or seclusion be made in a context designed to protect the patient from an arbitrary deprivation of personal liberty. *Negron v. Preiser, supra; Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972).[61]

Defendants' *policy* regarding seclusion and restraints recognizes the important liberty interests at stake and provides a procedure to guard against arbitrary depriva-

---

**60.** Testimony of Drs. Frank Rundle, Jonas Rappeport, and Hubert Carbone. Dr. Allen Barkley testified to the contrary, that it was his experience that mentally retarded patients often were put on medication for the sole purpose of controlling behavior problems.

**61.** In theory, this formal decision by a highly educated professional, that the symptom or condition exists, that this treatment is indicated and is not disproportionate to the "symptom," and that the treatment will not continue beyond the time it is indicated, accomplishes the function of protecting the pa-

tient from an arbitrary deprivation of a right or privilege which in a prison is accomplished by a form of due process hearing. *Negron v. Preiser*, 382 F.Supp. 535, 542 (S.D.N.Y.1974).

In *Davis v. Balson*, 461 F.Supp. 842, 877 (N.D. Ohio 1978), the court rejected defendants' attempt to distinguish between deprivations for disciplinary reasons and those made for treatment or therapeutic reasons. The court found as a fact that the deprivations at issue in that case were disciplinary in nature.

tion.[62] All seclusion or restraint orders must be signed by a doctor. Seclusion or restraint is to be used to protect the patient and others from his severe emotional outbursts, perhaps involving acts of aggression or of self-abuse. All other means of controlling the patient are to be tried before seclusion is used. A patient may be put in seclusion or restraints in an emergency by psychiatric aides. However, as soon as the emergency is under control, the doctor must be notified. Emergency use of seclusion or restraints may be no longer than twenty minutes. Within that time the doctor must see the patient and order continuation of the seclusion or restraint, if indicated. Written seclusion and restraint orders are effective for no more than twenty-four hours and must be renewed if seclusion or restraint is to be continued. A patient must be seen by aides every fifteen minutes and his condition charted every hour. Each incident of seclusion or restraint is to be reported in a manner to facilitate review of the doctor's decision. The reporting is to include how the seclusion or restraint is to be used, a description of the behavior that required such use, alternatives which were attempted or considered prior to the use of seclusion, and the duration of the order. All such incidents are to be reviewed by the treatment team and a separate review committee. The treatment program coordinators receive daily reports of the use of seclusion and restraints in the program.

Plaintiffs take issue, not with defendants' general policy regarding seclusion and restraints described above, but with the *practices* in the Forensic Unit. Based on their examination of patient records, plaintiffs' experts testified that the twenty minute limit on emergency seclusion is not observed; that there is often no indication that a secluded patient was seen by a doctor; that the time a seclusion began is often not in the record; that seclusion orders are signed without a doctor's examination; that insufficiently qualified staff, such as licensed practical nurses, are able to write seclusion orders; and, perhaps most importantly, that the records often do not indicate the *reasons* for seclusion, or are stated in such broad and vague terms that after-the-fact review of a decision to seclude is impossible.[63] A former Forensic Unit staff member testified that although, in her opinion, seclusion and restraints are used in a generally appropriate manner in the Forensic Unit, there were incidents when seclusion orders would be signed without an examination of the patient by the doctor. She also testified that a patient is generally seen by a doctor within one half-hour of an emergency seclusion.[64]

█ The Court concludes that the safeguards of defendants' policies regarding *medical* decisions to use seclusion or restraints are not adequately carried into practice to afford Forensic Unit patients minimal due process. This conclusion is based primarily on the lack of documentation of patient behavior leading to use of seclusion or restraints and of the reason to justify each incident of seclusion or restraints.[65]

█ Plaintiffs also argue that seclusion may not be used for disciplinary purposes. Although defendants' policy forbids the use of restraints and seclusion for punishment,[66] the record is clear that seclusion is used as a form of institutional discipline.[67] The Fo-

---

**62.** Missouri Department of Mental Health Operating Regulation No. 133 (Revised June 10, 1978); Fulton State Hospital Regulation No. 1100.09 (Rev. 4/74).

**63.** Testimony of Drs. Frank Rundle and Terry Brelje.

**64.** Testimony of Bonnie McBride.

**65.** This Court has no desire to restrict treatment decisions or interfere with the maintenance of security in the Forensic Unit. It is apparent to the Court that compliance by de-

fendants with certain aspects of their own seclusion and restraints policy would remedy this deficiency.

**66.** Missouri Department of Mental Health Operating Regulation No. 133 (Revised June 10, 1978).

**67.** Reasons for seclusion contained in patient records include: automatic seclusion for fighting (first incident—24 hour seclusion, second incident—48 hour seclusion, third incident—transfer to maximum security ward), mouthing

rensic Unit Director testified that seclusion is used if a patient presents a danger to himself or others *as well as* for infraction of ward rules.[68] Although plaintiffs' experts offered extensive testimony that seclusion is not an appropriate form of discipline in mental hospitals, the Court is not able to conclude that use of seclusion for disciplinary reasons is unconstitutional. Considering the type of patient confined in the Forensic Unit, it is clear that defendants are constantly presented with serious problems of security and the maintenance of orderly living conditions. Defendants could conclude that seclusion is a form of discipline necessary to sustain institutional rules.

However, if defendants use seclusion as a form of *discipline* for the violation of institutional rules, in contrast to a *medical* decision to seclude for some *therapeutic purpose*,[69] at the least they must comply with the minimal due process requirements in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). These include (1) written notice of the violation in advance of hearing, (2) a written statement by the fact finder of evidence relied upon and reasons for the disciplinary action, and (3) the opportunity to call witnesses and present other evidence in defense, when such opportunity will not be unduly hazardous to institutional safety. As it is clear that no such procedure is available to a patient before he is secluded for disciplinary purposes, the Court concludes that defendants' use of seclusion for discipline violates patients' due process rights.

For purposes of discussing the appropriate remedy, a conference of counsel will be ordered. At such conference, defendants will be required to submit to the Court a plan which will correct, with reasonable dispatch, the constitutional deficiencies noted in this Opinion. No order will issue at this time. Jurisdiction is retained.

---

off, walking off ward, disobeying, smart remarks, cursing, refusing to mop up spilled coffee, talking loud and smart aleck, and passing cigarettes to other patients in seclusion.

**68.** Testimony of Joseph Mangini.

**69.** *E. g.*, when a patient's violent behavior presents an immediate danger to himself or others.